James R. TRENT (Plaintiff)

v.

ATLANTIC CITY ELECTRIC CO., Gibbs and Hill, Inc. and Deepwater Operating Co. (Defendants) and Atlantic City Electric Co. (Defendant and Third-Party Plaintiff),

v.

GARDEN STATE CONSTRUCTION CO., Atlantic City Electric Co. and Deepwater Operating Co., Appellants.

James R. TRENT (Plaintiff)

v.

ATLANTIC CITY ELECTRIC CO., Gibbs and Hill, Inc., and Deepwater Operating Co. (Defendants) and Atlantic City Electric Co. (Defendant and Third-Party Plaintiff),

v.

GARDEN STATE CONSTRUCTION CO., Atlantic City Electric Co., Appellant.

James R. TRENT (Plaintiff)

v.

ATLANTIC CITY ELECTRIC CO., Gibbs and Hill, Inc., and Deepwater Operating Co. (Defendants) and Atlantic City Electric Co. (Defendant and Third-Party Plaintiff),

v.

GARDEN STATE CONSTRUCTION CO., Gibbs and Hill, Inc., Appellant.

Nos. 14481, 14482, 14526.

United States Court of Appeals Third Circuit.

Argued Jan. 20, 1964.

Decided July 23, 1964.

Rehearing Denied Aug. 25, 1964.

849

Milton M. Borowsky, Philadelphia, Pa.
(Abraham E. Freedman, Freedman, Landy & Lorry, Philadelphia, Pa., Sidney
A. Brass, Newark, N. J., on the brief),
for James R. Trent.

Herbert Horn, Atlantic City, N. J.,
(Lloyd, Horn, Megargee & Steedle, Atlantic City, N. J., McCord, Farrell & Eynon, by Sidney P. McCord, Jr., Haddonfield, N. J., on the brief), for Atlantic
City Electric Co., Gibbs and Hill, Inc.,
and Deepwater Operating Co.

Samuel P. Orlando, Camden, N. J., for
Garden State Const. Co.

Before BIGGS, Chief Judge, and FORMAN and GANEY, Circuit Judges.

BIGGS, Chief Judge.

This is an appeal by the defendants, Atlantic City Electric Company ("Electric Company"), Deepwater Operating Company ("Deepwater"), and Gibbs and Hill, Inc. ("Gibbs and Hill") from a judgment of $350,000. in favor of the plaintiff, James R. Trent, for injuries sustained as the result of an accident which occurred on November 15, 1956. The Electric Company as third party plaintiff has also appealed a judgment of no cause of action respecting its claim against the third party defendant, Garden State Construction Company ("Garden State").

■ Jurisdiction in the case at bar is based on diversity of citizenship and the law of New Jersey governs. The background facts are somewhat complex and need not be set out in full. The basic facts will be detailed in the paragraphs immediately following. Additional facts will be set out as required in the discussion of the particular issues.

## I

### Facts

(A) The Electric Company was the owner of the buildings and equipment of a power plant located at Deepwater, New Jersey. This plant furnished electricity to customers in the area. It was operated by Deepwater which was a wholly owned subsidiary of the Electric Company.

In January 1956 the Electric Company decided to have the capacity of the Deepwater plant expanded. On January 6, 1956 the Electric Company entered into a contract with Gibbs and Hill under which the latter agreed to perform the engineering and construction services on the Deepwater project. Gibbs and Hill was an engineering company engaged in construction.

On March 21, 1956 Garden State contracted with the Electric Company to perform the electrical work on the Deep-

water job. Garden State was an electrical contractor. The plaintiff, Trent, was an electrician of the highest classification, i. e., that of "journeyman," who was to be employed by Garden State on the Deepwater project.

The contract between the Electric Company and Gibbs and Hill in pertinent part provided: "We [Gibbs and Hill] propose to act as your [Electric Company's] engineers and constructors in connection with the design and installation of additional steam electric generating capacity at your Deepwater, New Jersey plant. * * * These services will be performed in cooperation with and at all times subject to the direction of you or your authorized representatives."

\* \* \* \* \*

"Acting as your engineers and constructors, we will work at all times in close cooperation with members of your organization, assuming as much responsibility as you may delegate to us, being guided in all respects by such instructions as you may from time to time give us. You will have full control of the work in all its phases, the selection and purchase of materials, machinery and equipment, letting of contracts, progress and sequence of the work, and all other questions. You may order additional work, cancel work previously authorized, or make other changes in either the scope or character of the work."

\* \* \* \* \*

"We will prepare and provide you, at regular intervals mutually agreed upon, with detailed progress reviews covering studies, design work, procurement of major and critical equipment, construction plans and progress, with the intent that you and we will mutually understand the status of progress.

"We propose to conduct our field construction work and to supervise the work of our field sub-contractors to the end that job progress is orderly, neat, and in accordance with good safety practices. We propose further to plan and conduct our work to maintain accomplishments in accordance with schedule and to ac-

tively pursue all opportunities to reduce costs either in the office, field, or in connection with material and equipment selection, purchase and/or handling."

The contract between the Electric Company and Garden State was prepared for the company by Gibbs and Hill. In relevant part it provided: "GIBBS & HILL, INC. are the Engineers pertaining to the work to be performed and the materials to be supplied under this agreement and are accepted as such by the parties hereto [Electric Company and Garden State]. All work provided for herein shall be done under the supervision and direction of the said Engineers or their representatives, and their decision as to the true construction and meaning of the drawings and Specifications shall be final and binding on the parties. In the performance of its work the Contractor [Garden State] agrees to cooperate with the Engineers and with all other contractors and subcontractors engaged by the Owner [Electric Company] in the construction of the said generating unit who may be on the premises while the work hereunder is being performed."

\*　　\*　　\*　　\*　　\*

"Contractor shall erect and maintain such danger signs, signals, red lights, guards, protective enclosures, platforms and notices as may be necessary to adequately protect the work and to protect all individuals against injury to their persons or damage to their property. The Contractor shall promptly replace any of the foregoing that must be removed temporarily during the progress of the work. If replacement is not properly made the Owner reserves the right to effect replacement at the expense of the Contractor.

"The Contractor shall provide and maintain for the protection of its employees such safety equipment, guarding and personal protective apparel as is prescribed for safe practices or as required by any law, ordinance rules or regulations or the exercise of ordinary prudence for the type of work being performed.

"The Contractor shall provide first aid equipment, supplies and competent administering of first aid as may be reasonably prescribed by good practice or as may be required by any laws for the care of injured personnel. Exceptions may be granted when the Owner has an established first aid station, dispensary or job hospital on or reasonably near the job site, in which case the Contractor may use such facilities on a cost per case basis as agreed to between the Contractor and Owner.

"The Contractor shall require its representatives to participate in the safety programs established by the Owner, including attendance at safety committee meetings as directed by the Owner. The Contractor shall, moreover, require its personnel to abide by the directives concerning job safety rules, regulations and safe practices thus established."

\*　　\*　　\*　　\*　　\*

"The Contractor shall at all times have in charge of the work to be performed hereunder a competent superintendent, who is thoroughly familiar with the classes of work covered by the electrical drawings and Specifications. The said ·Superintendent shall represent the Contractor, and all instructions given to him shall be as binding as if given to the Contractor. He shall have full authority to execute such instructions.

"At the Engineers' request, the Contractor shall submit in writing to the Engineers a record of the past experience of the Contractor's Superintendent, giving the dates and locations of his work, and the nature of the Superintendent's position. If the Owner finds that the said Superintendent lacks sufficient experience, or decides during the progress of the job that the Superintendent lacks the qualifications necessary to direct the work in the manner required by the electrical drawings and Specifications, or finds that the progress of the job indicates that the date of completion of the work cannot be met due to the incompetence or inexperience of the Superintendent, then the Engineers shall have the right by written notice to the Contractor to request the removal of the Superintendent and his replacement with anoth-

er Superintendent satisfactory to the Owner and the Engineers.

"The Owner or the Engineers may, directly or through their representatives, in writing request the dismissal by the Contractor or by any of its subcontractors of any foreman, workman, watchman or other employee whom the Owner or the Engineers deem incompetent, careless or otherwise a hindrance to the proper execution of the work; and the Contractor shall comply with such notice as promptly as practicable without detriment to the work."

Additionally the Electric Company-Garden State contract provided that a certain work-specifications document to be prepared by Gibbs and Hill was to form an integral part of the agreement. This document in pertinent part provided: "The Contractor shall execute, construct and finish the work in a substantial and workmanlike manner, under the direction and to the satisfaction of the Engineer in accordance with the Plans and Specifications and in conformity with the Contract, as modified by any subsequent Agreements. The Contractor shall keep one copy of all drawings and of the Specification at all times, in good order, available to the Engineer and the Engineer's representatives."

\* \* \* \* \*

"The Contractor shall furnish skilled superintendence and shall keep the necessary thoroughly competent construction foremen constantly upon the work, and employ only experienced mechanics and other labor as necessary to insure the completion of the work without delay. He shall promptly remove from the work any man or men who refuse or neglect to carry out the instructions of the Engineer's representative in charge of the work, or who are considered by the Engineer to be incompetent, or disorderly. He shall employ only such labor as will work in harmony with labor employed by other Contractors on the work."

\* \* \* \* \*

"The Engineer shall have full supervision over the work, and the Engineer's decisions as to quality and quantity of materials, equipment, labor and construction, the rate of progress of the work, and the meaning of the Specification and Plans shall be final and binding.

"Upon receipt of written notice from the Contractor that the work has been completed, the Engineer will give the entire work a thorough inspection. The Contractor, at that time, shall make any tests of the work required by the Engineer and any defects or omissions noted shall be made good by the Contractor before the acceptance of the work."

\* \* \* \* \*

"The Contractor shall conduct its operations in such a manner as to provide maximum safety for all employees on the work and the public as well. It shall comply promptly with such safety regulations as may be prescribed by the Engineer or the Owner and shall, when so directed by the Engineer or the Engineer's duly authorized agents, promptly correct any unsafe conditions created by, or unsafe practices on the part of, its employees. In the event of the Contractor's failure to comply, the Engineer or Owner may take the necessary measures to correct such conditions or practices complained of and all costs thereof will be borne by the Contractor. Failure of the Engineer to direct the correction of unsafe conditions or practices shall not relieve the Contractor of its responsibility hereunder."

\* \* \* \* \*

"The Contractor agrees to bind every Subcontractor and every Subcontractor agrees to be bound by the terms of the Agreement, General Conditions, Special Conditions, Drawings, and Specification as far as applicable to its work. Should disputes arise as to that which may be 'applicable to its work', the Engineer shall decide and such decisions shall be binding on all parties."

(B) The Deepwater property included a main building or power plant and a substation or switchyard. The power plant contained the requisite generators, boilers and turbines. The switchyard contained electrical equipment and con-

ductors from which energy was carried to Deepwater's customers. The switchyard was subdivided into various sections of different voltages, one of which was of 11 kilo-volts. This particular part of the switchyard (hereinafter termed "the switchyard") supplied electrical energy to the Chambers Division of E. I. du Pont de Nemours and Company.

The switchyard was composed of seven bays or sections which were similar in size and arrangement. The four northernmost bays constituted the switchyard's northern section and the three southernmost bays its southern section. By means of certain connections it was possible to cut off the current in either the northern or southern section and the section remaining in operation could furnish adequate energy to the Chambers Works.

Trent's unfortunate accident occurred at the southernmost bay of the southern section. Before certain changes indicated hereinafter had been brought about in the electrical installation in the area, the flow of current in and through the southernmost bay was in simplification as follows. The energy was transmitted to the area from the power plant by means of underground cable. This cable emerged from the ground and ultimately connected with three large identical switches termed air disconnects which were located above the ground and were affixed to the outer side of a steel structure about ten feet high (hereinafter referred to as "the steel structure"). The air disconnects each consisted of a movable part, the blade, and a stationary part, the jaw. When these switches were open, an air break was created in the circuit through which current could not flow.

From the three air disconnects the cable continued on its course and ran down to a three phase oil circuit breaker. From this point the cable ran up to a second identical set of three air disconnect switches located on the inner side of the steel structure and positioned back to back with the first set of switches. This second set of switches were termed the inside switches and the first-mentioned set of switches were referred to as the outside switches. A bus or metal conductor was connected with the jaws of each of the inside switches. These cross buses ran at right angles to and eventually connected up with three main longitudinal buses which ran in a north and south direction through all seven bays of the switchyard.

(C) The work to be accomplished on the Deepwater expansion project consisted basically of installing a new boiler and turbine generator in the power plant, running overhead cable from the plant to the switchyard and enlarging the capacity of the switchyard by installing larger equipment.

Gibbs and Hill was generally in charge of the whole operation. It employed on the site carpenters, boiler makers, iron workers, pipefitters, cement finishers, pipe coverers and laborers. It also employed full time structural, mechanical, electrical, and safety engineers.

Gibbs and Hill's safety engineer supervised in its safety aspect the work of all crafts on the job including the Garden State electricians. He periodically arranged for and presided over safety meetings for the supervisory personnel of all crafts. He also prepared written agenda to be referred to at general meetings of the workers of the various crafts.

Garden State apparently did not itself employ a safety engineer on the Deepwater project. It had, however, the usual supervisory foreman on the job in charge of the work in which it was engaged.

Gibbs and Hill's electrical engineer was in direct supervision over Garden State's electrical workers. He checked over the work as it progressed, coordinated the work with that of other trades, and issued instructions on a daily basis to Garden State's foremen concerning the work to be done. In the course of his duties, he arranged with an employee of Deepwater as detailed hereinafter, for outages and blockages of electricity in areas where Garden State employees were

required to work. The electrical engineer was the only individual on the project with authority to secure an outage. Although the record is far from clear on the point, it appears that in some instances he sought outages solely of his own decision and on other occasions he acted at the request of Garden State personnel.

Outages were secured from Deepwater's main control room supervisor. On request from Gibbs and Hill's electrical engineer, the supervisor would de-energize or cause to be de-energized electrical equipment in the switchyard for construction purposes. Similarly, on request from the electrical engineer, the supervisor would reactivate the blocked-out area when the work necessitating the particular outage had been completed. When a request for outage was made, for the purpose of devising an appropriate blocking procedure the supervisor would go out to the switchyard and acquaint himself with the scope of the work under consideration. He required Gibbs and Hill's electrical engineer to follow a prescribed procedure both in regard to securing an outage and with respect to returning the equipment to operation.

(D) The power to be produced by the new generator was to be carried through the overhead cable to the steel structure. There the cable was to be attached to the outside disconnects, run down to the oil circuit breaker, and then up to the inside disconnects from whence the current would flow out through the bus system. The existing air disconnect switches and oil circuit breaker were to be replaced with similar but larger or more efficient ones better adapted to be associated with the new and heavier load.

In order to support and carry the overhead cable which were to run from the power plant to the switchyard, three towers were to be erected. Two of these towers of entirely new construction had been erected in the yard between the plant and the switchyard by the latter part of October, 1956. The third tower on which work had not yet begun at this time, was to be the steel structure which was to be extended upward by new construction to the requisite height.

On October 29 and on the next succeeding three days the Garden State employees including Trent worked on and in the area around the steel structure. During working hours in this time, by previous arrangement, an outage was in effect with respect to the southern section of the switchyard. In this four-day period the steel structure was extended upward to a height of approximately fifty-five feet above the ground and the overhead cable which had been previously connected to the other two towers, was affixed to the steel structure and run down to the outside disconnects. Additionally, the outside and inside disconnect switches and the oil circuit breaker were replaced with larger ones of the same nature, new cross buses were connected from the jaws of the new inside switches to the main bus system, and two new control boxes were installed for the new switches at the foot of the south leg of the steel structure. Finally, the original oil circuit breaker and outside and inside air disconnect switches were relocated immediately south of the southernmost bay, the switches being affixed to a wooden pole or structure. By means of short conductors the jaws of the newly situated inside disconnect switches were connected with the main bus system. The relocated equipment was to serve as a temporary installation. Power was not to be transmitted through the newly installed circuit via the overhead cable until work on the new generator had been completed, which was to be six months later in May, 1957.

After all the work on and around the steel structure to which we have referred had been completed by the Garden State employees on November 1, 1956, Deepwater's main control room supervisor caused the newly installed sets of inside and outside air disconnect switches to be padlocked in an open position and also caused red tags on which appeared the word "Danger" to be attached to the control boxes. The tags signified that the disconnects were open and no one was to

close them. Open and locked switches in general practice represent a de-energized area. Shortly thereafter the supervisor terminated the outage of the working area and operation of the southern section was resumed.

The opening of the newly installed disconnect switches just described, created an air break in the electrical path beyond which current could not flow in either direction. Since the overhead cable was not to transmit power to the outside disconnect switches for several months, the only direction in which current could flow was in the opposite direction via the equipment in operation and bus system to the jaws of the inside disconnect switches at which points the flow would be interrupted.

Sometime after November 1, 1956 but prior to the date of the accident, November 15, 1956, several of the Garden State electricians were assigned to the job of synchronizing the opening and closing of the newly installed outside and inside disconnects. For the purpose of making these adjustments, the switches were temporarily unlocked from their open position. Trent took part in the synchronizing of the inside disconnects. This job was done by opening and closing the switches, noting the arc made during the process, and adjusting the switches accordingly. The jaws of the switches were energized during the course of the testing. After completion of the work on both sets of disconnects, the control boxes were locked and tagged a second time and their appearance was as before.

(E) The specific facts relating to the accident are as follows. For sometime prior to November 15, 1956, some of the Garden State electricians had been engaged in "sagging" the previously laid overhead cable or wires. Sagging was required in order to protect the wires from various climatic conditions. A wooden target consisting of an inverted "T" was used in the sagging process as an aid to ascertaining the proper degree of sag. At the time in question the target was attached near the top of the steel structure or tower extension to which the newly installed wires were affixed.

The accident to Trent occurred on the morning of November 15, 1956. By this time the sagging of one of the phases of the overhead cable had been finished. On that morning one of the Garden State electricians, desiring to commence the sagging of a different phase, instructed an apprentice on the stringing gang to move the target to a new position. Trent who was nearby was told to assist in the operation although he was not a member of the stringing gang and apparently had not had occasion prior to this time to climb the tower. Trent then proceeded to begin to climb up one of the legs of the tower, the apprentice after a momentary pause following behind him up the opposite side of the same leg of the tower.[1] When Trent had reached a position of about fifteen feet above the ground, he either came into contact with or into proximity with the energized jaw of the northernmost inside disconnect.[2] Whichever the case, an electrical circuit was created between the jaw and Trent's body causing him to teeter off balance and fall. As a result of the accident, Trent sustained severe multiple injuries requiring, to indicate only a few of the more serious consequences, the amputation of his right forearm, the removal of the pisiform of his left wrist, and the amputation of the fifth finger of his left hand.

Trent recovered a workmen's compensation award from his employer, Garden State, and instituted suit for damages against the Electric Company, Deepwater, and Gibbs and Hill. The Electric Company in turn impleaded Garden State on the basis of an indemnity clause in the work contract between the two parties. The case was submitted to the jury on interrogatories. The interrogatories

1. See the discussion in notes 15 and 16 infra.

2. See note 12 infra.

and the jury's answers thereto were as follows:

"1. Under all the facts and circumstances was the defendant, Atlantic City Electric Co., through its agents, servants or employees, negligent? Yes X No ___

"2. If the answer to the foregoing question is yes, was such negligence a proximate cause to the injury of the plaintiff, James Trent? Yes X No ___

"3. Under all the facts and circumstances was the defendant, Deepwater Operating Co., through its agents, servants or employees, negligent? Yes X No ___

"4. If the answer to the foregoing question is yes, was such negligence a proximate cause to the injury of the plaintiff, James Trent? Yes X No ___

"5. Under all the facts and circumstances was the defendant, Gibbs and Hill, Inc., an agent, servant or employee of Atlantic City Electric Co.? Yes X No ___

"6. Under all the facts and circumstances was the defendant, Gibbs and Hill, Inc., through its agents, servants or employees, negligent? Yes X No ___

"7. If the answer to the foregoing question is yes, was such negligence a proximate cause to the injury of the plaintiff, James Trent? Yes X No ___

"8. Under all the facts and circumstances was the third party defendant, Garden State Construction Co., through its agents, servants, or employees, negligent? Yes ___ No X"

\* \* \* \* \*

"10. Under all the facts and circumstances was the plaintiff, James R. Trent, guilty of contributory negligence? Yes ___ No X"

\* \* \* \* \*

"12. If you have found negligence on the part of either or all of Atlantic City Electric Co., Deepwater Operating Co. or Gibbs and Hill, Inc. and such negligence was the proximate cause of the injury and loss to James R. Trent and you have

found James R. Trent free from contributory negligence, what sum of money do you award to James R. Trent to compensate him for his injuries and loss under the rules I have laid down? $350,-000.00"

Judgment was entered upon the special verdict. Motions of each of the defendants for a new trial and for judgment n. o. v. were denied. These appeals followed.

## II

### Issues of Law

■■ The appellants have asserted a number of grounds why the judgments against them should be reversed and a new trial granted. The most basic of these relate to the charge and to whether or not there was sufficient evidence to support a jury finding of negligence as to each of them. We will deal with these questions in turn and then proceed to a consideration of the other issues raised.

The court below supplemented the interrogatories by charging the jury in pertinent part as follows: "The negligence that the plaintiff, Trent, charges against the defendants, Atlantic City Electric Company, the Deepwater Operating Company, and Gibbs and Hill, must be a proximate cause of the injury and the loss. Proximate cause is nothing more than the cause which sets or is responsible for putting into operation those things that produce the injury. It is the efficient cause, the one which necessarily sets the other cause in operation. An injury is proximately caused by an act or omission whenever it appears 1), that the act or omission played a substantial part in bringing about or actually causing the injury, and it further appears 2), that the injury was either a direct result or a reasonably probable consequence of the act or omission.

"You have heard a great deal about negligence in the last three weeks. What is it? Negligence is the doing of something which a reasonably careful or prudent person would not do under the same or similar circumstances (in other words, it is an act, an affirmative act), or, on

the other hand, it is the failure to do something which a reasonably careful or prudent person would have done under the same or similar circumstances. In other words, it can be either an affirmative act or a failure to do an affirmative act."

\*　　\*　　\*　　\*　　\*

"I referred to the prudent person. When I refer to the reasonably prudent person, I do not mean the person who, in your opinion, is the careless person, that person that you know, and of whom you say, well he is careless, he has little regard for the rights of others, nor, on the other hand, do I mean the over-cautious person, that person who, in your opinion, is a reasonably prudent person. That is the measure, that is the norm, that is the standard you go by in determining whether or not the defendant on the date and at the time and place in question acted as a reasonably prudent person.

"Ladies and gentlemen, one who is invited upon the premises of another is owed the duty by the invitor to render the premises reasonably safe for the purpose for which the invitee entered, and to abstain from any act which may make the invitee's use of the premises dangerous. An owner of land who invites workmen to come upon his premises is under a duty to exercise ordinary care to render reasonably safe that portion thereof in which he might reasonably expect them to be working. Where premises are placed in charge of a general contractor, he, in turn, is under a duty to an employee of a subcontractor to see that the premises being worked upon are reasonably safe. While ordinarily the adoption and operation of a method which accords with that in general use by well regulated companies satisfies the duty of care owed, nevertheless, the care which must be exercised over the construction and maintenance of a highly destructive agency such as electricity requires more than the use of mere mechanical skill and approved mechanical appliances. It includes, also, circumspection and foresight with regard to reasonably probable contingencies."

\*　　\*　　\*　　\*　　\*

"I charge you that if you find that the defendants, or either of them, created an unnecessary hazardous condition and failed to take proper and adequate measures to render that condition safe by the use of proper and adequate protective and warning devices, and if you further find as a consequence of this act the plaintiff was injured, you should find in favor of the plaintiff against the defendants Atlantic City Electric Company and/or Gibbs and Hill, Inc., provided, however, that you also find that the plaintiff was free of contributory negligence."

The appellants raise three objections with respect to the above-quoted part of the charge which require discussion, the first relating to particular statements contained in the charge, the second and third, which are interrelated, concerning certain omissions from the charge. The appellants first contend that the charge constituted reversible error on the ground that "in these instructions the court below imposed a duty of reasonable care to attain absolute safety and also an absolute duty to secure reasonable safety" and that "where there are two inconsistent instructions, one correct, another erroneous, the error is not cured unless the erroneous instruction is expressly withdrawn." [3] While it seems apparent that to some degree the instructions were inconsistent as asserted, we cannot agree that such deficiency constituted prejudicial error. We think that the charge when read as a whole and in light of the interrogatories, cannot reasonably be said to have substantially misled the jury.[4]

---

3. Brief for Appellants, Electric Company and Deepwater, p. 16. Appellant Gibbs and Hill in order to avoid repetition has expressly adopted the arguments advanced on behalf of the other two defendants insofar as they be relevant to its cause.

4. None of the appellants specifically objected to the charge on this ground prior to submission of the case to the jury. The appellants, however, were granted automatic exceptions as to those of their requests for charge which were refused and

The appellants' second contention is that the court below erred in denying their requests for charge relating to control of the work of the Garden State employees on the Deepwater project. The submitted instructions which for present purposes were similar in substance, are set out below.[5] Automatic exceptions were granted for the refusal to charge them as requested.[6] The proffered instructions can be described essentially as setting forth as determinative of the respective questions of primary negligence on the part of the appellants whether or not each one had a general right of control over Garden State and its employees in regard to the manner of performance of the former's contractual obligations. In short, in the requests a respondeat superior type of test respecting Garden State was propounded as being dispositive of the issue of primary negligence posed as to each of the appellants.

In our view the court below did not err in refusing to charge these requests for they did not set forth the pertinent test respecting primary negligence under New Jersey law in the circumstance at bar. Section 414 of the Restatement of Torts provides as follows: "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for bodily harm to others, for whose safety the employer owes a duty to exercise rea-

those of Trent's requests for charge which were granted. And one of Trent's requests for charge which was granted was the "unnecessary hazardous condition" instruction set out in the opinion. *We take this opportunity to point out that the practice of granting automatic exceptions in this manner runs contra to both the letter and the spirit of Rule 51 of the Federal Rules of Civil Procedure.* We express no opinion on the question of in what circumstances and to what extent a point can be validly preserved for appeal by this procedure. The issue is not critical here for all points so "preserved" in this case involve non-prejudicial matters.

5. The instructions were as follows: "15. I charge you that mere reservation of supervision for the purpose of seeing that the contract work to be done by the independent contractor is done in compliance with the plans and specifications is not control of the work or the manner of doing it, and does not operate to put the landowner or general contractor 'in charge' of the place or impose upon either the landowner or general contractor any duty to a workman of the independent contractor so long as the supervision relates only to the results and not to the method of doing the work."

"16. I charge you that even if Atlantic City Electric Company or Gibbs & Hill or Deepwater Operating Company had knowledge that Garden State Construction Company was violating safety rules in connection with the work that the latter's employees were performing, it is not sufficient to charge any of said parties with liability, so long as you find that none of said parties was in charge of or exer-

cising control and direction of the work, or directing the independent contractor's employees in the doing of same from the standpoint of the means as compared with the result."

"17. I charge you that if you find that none of the defendants Atlantic City Electric Company, Deepwater Operating Company or Gibbs & Hill, exercised control over the plaintiff from the standpoint of giving directions to him with respect to how his work was to be done, as contrasted to directions with respect to the results of the work to be done, then they would not be liable for injuries to him resulting from the manner in which the work is performed."

"18. I charge you that Atlantic City Electric Company, Deepwater Operating Company and Gibbs & Hill had a right to check on the work with respect to the result without making themselves liable to the plaintiff for injuries sustained by him."

"44. I charge you that control as has been mentioned in this case is to be distinguished between control over the results of the work to be accomplished or control over the manner of the doing of the work. If you find that the Garden State Construction Company was charged with and actually did have control over the manner of the performance of the work by the plaintiff, the mere fact that Gibbs & Hill or Atlantic City Electric Company were interested in the results of the work, would not make either of said Gibbs & Hill or Atlantic City Electric Company liable even if there was negligence insofar as the aforementioned control is concerned."

6. See note 4 supra.

sonable care, which is caused by his failure to exercise his control with reasonable care." Comment *a* under the section states the following: "If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the Law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." This section of the Restatement has been recognized by New Jersey courts as being applicable in similar situations. See Marion v. Public Serv. Elec. & Gas Co., 72 N.J.Super. 146, 178 A.2d 57 (App.Div.1962); Bergquist v. Penterman, 46 N.J.Super. 74, 134 A.2d 20 (App.Div.), certification denied, 25 N.J. 55, 134 A.2d 832 (1957). See also Riley v. Jersey Leather Co., 100 N.J.L. 300, 126 A. 457 (Ct.Err. & App.1924). The rule is directly applicable to the Electric Company and by analogy in substance applies to Deepwater and Gibbs and Hill. It is sufficiently obvious that if the court below had instructed the jury in accordance with the foregoing requests, Trent would have been materially prejudiced.

 Last, the appellants assert that the charge did not delineate properly the respective duties owed by them to Trent.

This broad objection was not made below prior to submission of the case to the jury. We think that some or all of the appellants upon proper request would have been entitled to have submitted to the jury an instruction or instructions grounded upon the principle underlying Section 414 as it applied to each of them under the facts of this case. But no such request for charge or objection to lack of charge was made by any of the parties,[7] nor have they even drawn our attention to Section 414 on this appeal.

This court has on occasion reversed sua sponte on the basis of plain or fundamental error respecting the charge. See, e. g., Mazer v. Lipschutz, 327 F.2d 42 (3 Cir. 1963); McNello v. John B. Kelly, Inc., 283 F.2d 96 (3 Cir. 1960). This discretionary power is exercised sparingly in order to prevent only what is deemed to be a miscarriage of justice. We need not express an opinion on whether the deficiency in the present charge constituted fundamental error within the meaning of our decisions for in any event under the facts and circumstances of this case, in our view the jury's findings as to the appellants' negligence cannot be said to manifest a miscarriage of justice. In regard to Deepwater and Gibbs and Hill, as is indicated infra, the evidence was more than sufficient to justify findings of negligence on their part even under a more properly detailed charge. With respect to the Electric Company, the question is moot in view of what we conclude hereinafter in this opinion.

██ The jury, as previously indicated, in answer to the interrogatories, found that Gibbs and Hill, Deepwater, and the Electric Company were all guilty of negligence which proximately caused Trent's accident and resulting injuries. We will now proceed to consider these findings and to the extent deemed permissible, review the evidence in support thereof.

7. Rule 51 of the Federal Rules of Civil Procedure provides in pertinent part as follows: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury "

In so doing, of course, the evidence will be viewed in the light most favorable to Trent. See Massaro v. United States Lines Co., 307 F.2d 299, 303 (3 Cir. 1962).

█ For reasons stated hereinafter, we deem it to be improper to review the evidence relating to possible primary negligence on the part of the Electric Company. With respect to Deepwater and Gibbs and Hill, we conclude that the jury's findings as to their negligence are justified by the record. Although additional sufficient bases for findings of negligence may be present in order not to extend unnecessarily the length of this opinion we restrict our discussion as to each of these two appellants to what seem to be the most plainly evident theories of liability.

With respect to Deepwater, the evidence demonstrated that it was the actual occupant of the premises on which the accident occurred. It was to benefit directly from the work being done, the end result of which was to be the expansion of its facilities. The equipment being used by it and the power being supplied to its customers brought about Trent's accident. At no time during the course of the work did Deepwater relinquish control, through its authorized servants, over that part of the electrical installation which was in operation. Deepwater's main control room supervisor actually witnessed the installation of the cross bus stubs in the south bay of the switchyard and the subsequent adjustment of the inside disconnect switches by arcing. It was he, who when satisfied with the adjustment, had the switches locked in an open position and the control boxes tagged, the keys to the boxes being kept by Deepwater employees.

Deepwater's main control room supervisor and other of its personnel were better acquainted than anyone else with the path taken by the energy under the electrical set-up existing at the time of Trent's accident. Through its authorized servants, Deepwater knew or should have known that under the electrical arrangement as it then existed, energy was being carried to the jaws of the inside disconnect switches by means of the newly installed cross bus stubs and that these bus stubs were not a necessary part of the then-functioning electrical circuit. It also knew that the employment of the cross bus stubs for conduction of energy would not become necessary until work on the new generator was completed and the new circuit became operative at which time current would flow in the opposite direction via the overhead cables. Had the bus stubs been removed after they had been measured and fitted there would have been at all times an air break or gap in the electrical system sufficient to render the tower area safe for the electricians. Particularly in view of the serious risk involved, the jury could have found from the evidence with respect to Deepwater that such a precaution was practicable and should have been taken under the circumstances. Additionally or alternatively, at least in view of the control actually exerted by Deepwater employees with respect to the tagging of the newly installed control boxes, the jury could have found that its personnel were negligent in failing to mark at this same time the cross bus stubs by flag or tapes which would have signified the presence of a live conductor.[8] We conclude that the jury's finding as to the negligence of Deepwater should not be disturbed.

█ We also are of the view that there was sufficient evidence to support the jury's finding of negligence on the part of Gibbs and Hill. The extent to which Gibbs and Hill was in general control of the work on the Deepwater project has already been detailed. With respect to the particular circumstances surrounding Trent's accident, the evidence indicated that Gibbs and Hill through its authorized servants knew that the

8. The evidence indicated that prior to Trent's accident, Deepwater personnel had on some occasions tagged live conductors in this manner in the plant for the benefit of its own employees.

jaws of the inside disconnect switches were energized. It could have reasonably anticipated that one of the Garden State electricians in the course of his duties might be called upon to climb the tower and that in so doing, he might possibly come into dangerous proximity to the energized jaw, with consequent risk of serious injury. Gibbs and Hill knew or had reason to know that the risk of injury could have been avoided or at least substantially minimized by having warnings posted at the energized location. Furthermore, a request could have been made upon Deepwater's main control room supervisor to disconnect temporarily, while work was in progress in the switch area, the newly installed cross bus stubs through which energy was being carried to the jaws of the switches. The jury could have found that either of these precautions should have been taken and that Gibbs and Hill was at least jointly responsible for the failure to act. On the basis of the foregoing, the jury's finding of negligence on the part of Gibbs and Hill cannot be successfully challenged.[9, 10]

9. Introduced at the trial was part of a deposition made by a Garden State co-worker of Trent on the Deepwater job. The questions of Trent's counsel and the electrician's answers thereto as read into evidence were as follows:

"Q. Was there any particular means provided to climb the tower at the 11 K.V. switchyard prior to Mr. Trent's accident? A. No, sir, there wasn't. But after the accident they supplied us with an extension ladder that was made fast to the tower.

"Q. Was there any particular method that the men were instructed to use in climbing the tower? A. No, sir, there was no particular method, just every which way we could get up.

"Q. Were there any ladders provided for getting to the area in which the target had to be moved prior to the accident? A. No, there was no ladders available. We did have a 10-foot stepladder that laid over against where our gangbox was, but it wasn't long enough to be of any assistance.

"Q. After Mr. Trent's accident, was the subject of climbing the tower discussed? A. Yes, and we were forbidden to climb the towers until they had installed the ladders on all of the towers that we were to climb. The ladders was brought in, supplied by Gibbs and Hill and put up by their carpenters.

"Q. When did the discussion, if any, take place with respect to the subject of climbing the towers after Mr. Trent's accident? A. It took place the following morning at the place where we generally have had our safety meetings. Mr. Gaul told us that the towers would not be climbed any more; the work would be suspended until ladders were installed onto the towers.

"Q. Who was Mr. Gaul? A. He was safety engineer of Gibbs and Hill.

"Q. Who was present when this meeting took place? A. It was all of us that worked out there in the yard and there also—all the electricians that morning, and they cautioned us to be a little more careful because a man had been injured, and they stressed again, as they did at all the safety meetings that we wear our hard hats.

"Q. Had you ever seen Mr. Gaul before the meeting that was held the day after the accident? A. Yes, around the job there and he had been at a number of our safety meetings at one time or another. Mr. Anson [Gibbs and Hill's electrical engineer] had been there several times, and I had seen Mr. Gaul traveling around the job."

The court below properly limited the jury in its consideration of this evidence by means of the following charge: "Ladies and gentlemen, there has been testimony in this case that after the accident wooden ladders were installed and used by the men to climb the towers. I charge you that this testimony is allowed for only one purpose, and that is to aid you to determine where the control of the work and the workers lay. It is not to be used or considered by you in the determination of the question of negligence. Hindsight is always better than foresight. The law recognizes this, and does not impose upon anyone the duty of exercising that degree of care of anticipating all problems that may arise but does impose the duty of anticipating those things, under the circumstances, that an ordinary prudent person should anticipate and guard against. So that such testimony regarding the ladders is strictly limited to the purpose of helping you to determine who had control of the work and the workers."

One of the well-recognized exceptions to the general rule that evidence of sub-

10. See note 10 on page 862.

With respect to the Electric Company, we do not think it proper to review the evidence relating to its possible primary negligence for the reason that the jury's finding of liability on its part is wholly inconclusive of a determination of such negligence. It will be remembered that Interrogatories 1, 2, 5, 6, and 7, and the jury's answers thereto were as follows: "1. Under all the facts and circumstances was the defendant, Atlantic City Electric Co., through its agents, servants or employees, negligent? Yes X No ___ " "2. If the answer to the foregoing question is yes, was such negligence a proximate cause to the injury of the plaintiff, James Trent? Yes X No ___ " "5. Under all the facts and circumstances was the defendant, Gibbs and Hill, Inc., an agent, servant or employee of Atlantic City Electric Co.? Yes X No ___ " "6. Under all the facts and circumstances was the defendant, Gibbs, and Hill, Inc., through its agents, servants or employees, negligent? Yes X No ___ " "7. If the answer to the foregoing question is yes, was such negligence a proximate cause to the injury of the plaintiff, James Trent? Yes X No ___ " It seems obvious that the jury's answers to Interrogatories 5 through 7 were determinative or should have been determinative of its conclusions with respect to

the first two interrogatories. Interrogatories 1 and 2 were so framed that in answer thereto the jury was allowed to apply the court's charge on the doctrine of respondeat superior. The jury found or should have found that the Electric Company was negligent by imputing to it the negligence of its "agent, servant, or employee," Gibbs and Hill.

The question of the applicability of the doctrine of respondeat superior to the Electric Company for the negligence of Gibbs and Hill will be discussed at a later point in this opinion. What is of pertinence at this point is solely the issue of the individual negligence of the Electric Company through its own direct employees and admitted servants. It is obvious that in the context of this case the jury's answers to the first two interrogatories cannot reasonably be deemed to constitute a finding of primary negligence on the part of the Electric Company. It would be entirely speculative to conclude that the jury actually found the Electric Company to be negligent in this sense. If this court were to review the evidence as if such a finding had been made, the evidence would have to be viewed in the light most unfavorable to the Electric Company. This course of action would materially prejudice the Electric Company. It need hardly be mentioned that a negligence action contemplates what is

sequent repairs and precautions is inadmissible is when the evidence is introduced to show that the defendant had control of a particular location or of a given instrumentality when that issue is in dispute. See Spinelli v. Golda, 6 N.J. 68, 77 A.2d 233 (1950); Schwartau v. Miesmer, 50 N.J.Super. 399, 142 A.2d 675 (App.Div.), certification denied, Schwartau v. Borough of Closter, 28 N.J. 34, 144 A.2d 736 (1958). See also Apgar v. Hoffman Const. Co., 124 N.J.L. 86, 11 A.2d 25 (Ct. Err. & App. 1940). It is, of course, scarcely open to question that the matter of control was one of the most fundamental issues in the case at bar. Moreover, in view of the court's charge on the subject, no substantial prejudice could have resulted from the introduction of the deposition.

10. Gibbs and Hill objects to the jury's use of the evidence respecting ladders set out in note 9 supra, because it was not permitted to consider the contract between the Electric Company and Garden State for any purpose other than to determine whether Garden State had been negligent. Gibbs and Hill seems to argue that it could be concluded that the provisions of the contract removed any duty it might have otherwise had to install ladders at the job site. The facts and circumstances of this case belie its purported analysis. Implicit in this opinion is the view that Gibbs and Hill owed a common law duty of reasonable care to Trent. Through its authorized servants it had actual knowledge that Garden State had not installed any ladders. It certainly cannot tenably argue that it relied on Garden State to supply ladders when it had actual knowledge to the contrary.

fundamentally an adversary type of proceeding. It is the duty of counsel for plaintiff to see to it that each and every wholly distinct theory of liability he desires to have submitted to the jury is actually submitted to the jury. This court will not allow a party to obtain a possible benefit from counsel's failure in this regard at the expense of an opposing party. We therefore hold that the question of the primary negligence of the Electric Company cannot properly be considered on this appeal.

In the instant case, however, the judgment against the Electric Company can be upheld on the basis of the doctrine of vicarious responsibility. Under the facts and circumstances of this case, we think that the Electric Company as a matter of law is accountable for the negligence of both Gibbs and Hill and Deepwater. Distinct questions are posed, however, and require separate discussion.

With respect to the liability of the Electric Company for the negligence of Gibbs and Hill, the court below submitted the matter to the jury under a charge as to application of the doctrine of respondeat superior. The charge reads as follows: "Ladies and gentlemen, in this case, we have the question of the relationship between the Atlantic City Electric Company, on the one hand, and Gibbs and Hill, on the other. Were Gibbs and Hill the agent, and employee of Atlantic City Electric Company or were they what is known in the law as an independent contractor? If Gibbs and Hill were the agent or employee of the Atlantic City Electric Company, then Atlantic City Electric Company is responsible for any negligent conduct of Gibbs and Hill. Generally, the relationship of employer, on the one hand, and employee or agent, on the other, exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the results to be accomplished by the work but also as to the details and means by which that result is accomplished, that is, an employee or agent is subject to the will and control of the employer not only

as to what shall be done but how it shall be done. In this connection it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. If so, the relationship of employer, on the one hand, and employee or agent, on the other, exists, and the employer is responsible for the negligent acts of the employee or agent. On the other hand, if an individual is subject to the control or direction of another merely as to the results to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor, and not an employee or agent. If Gibbs and Hill were independent contractors, and if you find they were negligent then Atlantic City Electric Company would not be responsible for their actions." As previously indicated, the jury found in answer to the fourth interrogatory that Gibbs and Hill was an "agent, servant, or employee" of the Electric Company.

The Electric Company does not dispute the substance of the charge as set out in the immediately preceding paragraph. It contends, however, that the question of its relationship to Gibbs and Hill was for the court and not for the jury. It also asserts that the issue should have been resolved in its favor. It is our view that only the first point urged by the Electric Company is meritorious.

The relationship between the Electric Company and Gibbs and Hill, of course, was essentially defined by the terms of the Deepwater contract between the parties. For present purposes the pertinent language in the contract is sufficiently contained in the following two paragraphs: "We [Gibbs and Hill] propose to act as your [Electric Company's] engineers and constructors in connection with the design and installation of additional steam electric generating capacity at your Deepwater, New Jersey plant, to furnish process steam and power to the Chambers Works of E. I. du Pont de Nemours & Company. These services will be performed in cooperation with

and at all times subject to the direction of you or your authorized representatives."

\* \* \* \* \*

"Acting as your engineers and constructors, we will work at all times in close cooperation with members of your organization, assuming as much responsibility as you may delegate to us, being guided in all respects by such instructions as you may from time to time give us. You will have full control of the work in all its phases, the selection and purchase of materials, machinery and equipment, letting of contracts, progress and sequence of the work, and all other questions. You may order additional work, cancel work previously authorized, or make other changes in either the scope or character of the work."

■■■ Under New Jersey law, absent parol evidence admitted to aid in construction and absent evidence of trade custom introduced to explain special terminology employed, it is the duty of the court to interpret a contract for the instant purpose. See Marion v. Public Serv. Elec. & Gas Co., supra, 72 N.J. Super. at 154, 178 A.2d at 61. No contention has been advanced that such evidence was introduced in the case at bar. The question therefore was one for the court.

■■■ Inasmuch as the resolution of the issue should have been determined solely by reference to the contract, this court is just as competent to decide the question as would have been the court below. See State of Maryland v. United States, 329 F.2d 722, 723 (3 Cir. 1964). Moreover, we are of the view that the language employed in the contract is such that the question is one of law. It is difficult to conceive of a contract that could have provided more explicitly than the one at bar for the full retention by the Electric Company of the right to control the work. Among other terms the contract provided that the Electric Company was to have "full control of the work in all its phases," including "progress and sequence of the work, and all

other questions." The contractual language in question here differs in substance from that considered in Marion v. Public Serv. Elec. & Gas Co., supra. For purposes of the application of the doctrine of respondeat superior, the right to control is determinative in the sense that the failure to exercise that right in no way negates liability. No reason has been advanced why the plain meaning of the contract should not be dispositive of the issue at bar. We therefore hold that the Electric Company is accountable to Trent for the negligence of Gibbs and Hill under the doctrine of respondeat superior.

■■■ In addition, we conclude that as a matter of law under the facts and circumstances of this case the Electric Company is accountable to Trent for the negligence of Deepwater. Deepwater as previously indicated was a wholly owned subsidiary of the Electric Company. In this regard the New Jersey Court of Chancery in Rippel v. Kaplus, 124 N.J. Eq., 303, 304, 1 A.2d 883, 884 (1938), quoting the United States Supreme Court, stated, albeit in another context, that "[w]hile one company's ownership of shares of the capital stock of another does not necessarily create an identity of corporate interests between the two, 'yet where such ownership of stock is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, or instrumentality or department of another company, the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require.'" If the parent corporation controls the subsidiary and directs its affairs, the corporate fiction will be disregarded and the subsidiary viewed as a mere instrumentality, the torts of which are chargeable to the principal. Cf. Mueller v. Seaboard Commercial Corp., 5 N.J. 28, 73 A.2d 905 (1950). See generally 1 Fletcher, Cyclopedia Cor-

porations § 43 (rev. vol. 1963); 10 Id. § 4878 (rev. vol. 1961).

In our view it is plainly evident that in regard to matters pertaining to the Deepwater expansion project, Deepwater was a mere instrumentality or business conduit within the meaning of the foregoing rule. The parties to this action did not view Deepwater as a distinct entity at pertinent times. In the contracts executed by the Electric Company with Gibbs and Hill and Garden State, Deepwater when mentioned at all, was referred to as "your [i. e., Electric Company's] Deepwater, New Jersey plant" or the "Deepwater Station." Compare Ross v. Pennsylvania R. R. Co., 106 N.J.L. 536, 148 A. 741 (Ct.Err. & App.1930). Insofar as we are aware, in none of the documents relating to the expansion operation was mention made of Deepwater as a corporation or as an entity separate and apart from the Electric Company.[11] Wholly apart from the foregoing, however, the very fact that the Electric Company bypassed Deepwater in executing the work contracts for the expansion project on its own account, to our mind conclusively indicates that Deepwater must be considered as an instrumentality within the purview of the rule for all purposes pertaining to the subject matter of the contracts. We therefore hold that as a matter of law under the facts and circumstances of this case, the Electric Company is accountable to Trent for the negligence of Deepwater.

The appellants next contend that Trent was contributorily negligent as a matter of law and that therefore the case should not have been allowed to go to the jury. In Saporito v. Holland-America Lines, 284 F.2d 761, 765 (3 Cir. 1960), this court quoting and citing pertinent New Jersey decisions, set out the standard applicable here as follows: "In order to hold a plaintiff contributorily negligent as a matter of law such negligence: ' * * * must appear clearly and conclusively as a fact or as a necessary and exclusive inference that would be drawn by all reasonable men in the exercise of fair and impartial judgment.' Gudnestad v. Seaboard Coal Dock Co., 1954, 15 N.J. 210, 222, 104 A.2d 313, 319. To the same effect are Berger v. Shapiro, 1959, 30 N.J. 89, 152 A.2d 20; De Rienzo v. Morristown Airport Corp., 1958, 28 N.J. 231, 146 A.2d 127. Furthermore, only in the clearest case of contributory fault where the contrary hypothesis is not fairly admissible, does the question become one of law for decisive action by the court. Battaglia v. Norton, 1954, 16 N.J. 171, 179, 108 A.2d 1; Seipel v. Sevek, 1959, 29 N.J. 593, 152 A.2d 47." While we think that under the facts of this case the jury could reasonably have found negligence on the part of Trent, on the basis of the foregoing test the question cannot validly be said to be one of law.

Trent had been a journeyman electrician for approximately six years prior to the accident and presumably possessed the skill of a seasoned electrician. As was not unusual in the case of a journeyman electrician, he had had no previous experience in power line work. On the Deepwater project he had not been assigned to string lines nor until the accident date, had he had occasion to climb the steel structure for any reason. It was wholly fortuitous that he was nearby when a regular member of the stringing gang sought his assistance to move the target.

Sometime between one and two weeks prior to the accident, Trent in the course of his duties had assisted in the job of synchronizing the newly installed inside disconnect switches by arcing. The switches, necessarily, were energized on this occasion and of course Trent had actual knowledge of this fact. He also knew at the time of the test that the power supplying the switches was being carried via a connection other than the

---

11. Additionally, indiscriminate references to Deepwater personnel as Electric Company employees evidenced in some of the testimony adduced at the trial below, indicates that at least a considerable number of the men on the job did not recognize any distinction between the two companies.

overhead lines which were not to transmit electricity until work on the new generator was completed.

Trent knew the switches were designed to control current that was to come to them from the overhead cables and not vice versa. Since there was no essential reason for the jaws of the switches to be continuously energized, he apparently assumed that the power was being supplied to them temporarily, for the purpose of the tests. He had not seen blueprints of the location and was not acquainted with the manner in which current was brought into the area by the underground cable and distributed through the bus system.

When just preceding the accident he was told to assist in moving the target and accordingly began to climb the tower, he acted on the assumption that the jaws were no longer energized.[12] The appellants take the position that before beginning to climb, Trent should have employed a glow stick to test for the presence of electricity, or inquired into the matter of his superiors, or taken some other precaution. The appellants' contention seemingly can be reduced to an assertion that Trent was negligent as a matter of law for proceeding under the assumption that the jaws were no longer energized. Viewing the evidence, as we must, most favorably to Trent, we think Trent's assumption and his action pursuant thereto, cannot be termed unreasonable as a matter of law. The newly installed switches were not part of the electrical circuit in operation at the time of the accident. Moreover, there were no warnings posted around the switches and cross buses to indicate clearly to him the presence of electricity. Finally, he was not a member of the stringing gang and it certainly was not wholly unreasonable for him to act on a basis that if there was any danger inherent in the job that he was told to do, he would have been forewarned to that effect or at least given some direction. For the sum of the foregoing considerations we cannot conclude that Trent was contributorily negligent as a matter of law.[13]

12. There is no evidence in this case as to how Trent came in contact with the energized jaw. A favorable inference in this regard is that he lost his footing while climbing the diagonal angle irons and fell against the jaw of the switch. Trent, himself, suffered retrograde amnesia as a result of the accident and has been unable to recall what happened on the unfortunate day.

13. The appellants also attempt to support their position that the case should not have gone to the jury by citing a number of New Jersey cases dealing with the concept of operational hazard. They also complain of the refusal of the court below to grant their requests for charge on this point. Representative of the cases cited as support are the following: Broecker v. Armstrong Cork Co., 128 N.J.L. 3, 24 A.2d 194 (Ct.Err. & App.1942); Wolczak v. National Elec. Prods. Corp., 66 N.J. Super. 64, 168 A.2d 412 (App.Div.1961); Jensen v. Somerset Hosp., 58 N.J.Super. 204, 156 A.2d 25 (App.Div.1959), certification denied, 31 N.J. 551, 158 A.2d 451 (1960); Mergel v. Colgate-Palmolive-Peet Co., 41 N.J.Super. 372, 125 A.2d 292 (App.Div.), certification denied, 22 N.J. 453, 126 A.2d 392 (1956). In our view the decisions cited are not dispositive here for the following fundamental reason. The doctrine of operational hazard in the sense urged by the appellants is no more than what is essentially a particular example of the concept of assumption of risk in the primary sense. The New Jersey Supreme Court has recently and wisely done away with assumption of risk in both primary and secondary senses as concepts distinct from negligence and contributory negligence respectively, stating the following: "Experience * * * indicates the term 'assumption of risk' is so apt to create mist that it is better banished from the scene. We hope we have heard the last of it. Henceforth let us stay with 'negligence' and 'contributory negligence.'" McGrath v. American Cyanamid Co., 41 N.J. 272, 276, 196 A.2d 238, 240–241 (1963). Whether or not these words of the New Jersey Supreme Court can be validly said to have obliterated the doctrine of operational hazard as a distinct concept in all possible situations, we need not decide at this time. It is sufficient to state that under the facts and circumstances of this case, i. e., a situation in which appellants maintained continuous control over a risk which could have been eliminated or at least substan-

The appellants next contend on the issue of damages that the court below committed prejudicial error by refusing to charge the jury as they had requested that it must reduce to present worth the amount of future loss of earning capacity found to be suffered by Trent. Trent as well as the appellants submitted a request for charge on this matter and both instructions were refused. When exceptions to the charge were being noted outside of the presence of the jury, the appellants specifically objected to the court's refusal to instruct present value as requested and shortly thereafter counsel for Trent brought the matter to the court's attention a second time. The colloquy between counsel for Trent and the court was as follows: "Mr. Borowsky: If the court please, I think, the court touched on something that should be corrected at this time, and that is that the present value wasn't clearly brought to the attention of the jury.

"The Court: No, it wasn't, and it was done deliberately, and I do not intend to change the charge as such. As I indicated in the charge regarding mortality tables, and the use of the actuarial tables, they are not hard and fast binding rules, and it is for them to use that evidence in their own good judgment. That is what I charged them. You may have an exception to that." The jury in answer to the twelfth interrogatory returned a

verdict in Trent's favor in the amount of $350,000.

 We are constrained to agree with the contention of the appellants that prejudicial error was committed by the court's refusal to charge present value. The appellee does not even attempt to argue that it was not error under New Jersey law to refuse to charge present value upon appropriate request. See, e. g., Noa v. LeGore, 131 N.J.L. 229, 35 A.2d 691 (Ct.Err. & App.1944); Kappel v. Public Serv. Ry. Co., 105 N.J.L. 264, 144 A. 182 (Sup.Ct.1929). He does assert, however, that the deficiency in the charge was not prejudicial pointing to certain references to present value contained in the summations of counsel and certain allusions by the court in the charge to the testimony on the point adduced at trial. It is sufficient to state that statements of counsel do not have the force and effect upon a jury as do instructions by the court and that the comments by the court in the instant case fall short of anything closely approaching an express direction concerning reduction to present worth. While the injuries suffered by Trent as a result of the accident were substantial, it can hardly be gainsaid that the deficiency in the charge could have had a prejudicial effect with respect to the jury's damage computation.[14] We conclude that the failure to

tially lessened by the exercise of reasonable care, the appellants had no right to be granted an instruction on this point.

14. During the course of the hearing on motion for new trial, the court below made the following statement with respect to the verdict in the case at bar: "On the question of damages it is significant to the court that a considerable number of conferences were held both before the commencement of the trial and during the trial. These negotiations led ultimately to a position upon the part of the plaintiff through his counsel would accept a sum slightly under $190,000 together with certain considerations under the workmen's compensation law, and the defendants were willing to pay slightly over $180,000 or a difference of less than $10,-000.

"Now, this observation is not made with the thought that the defendants could have settled for considerably less than the amount of the ultimate verdict, that they did not, it serves them right and therefore the court will leave them where they find themselves. This in my estimation would be an improper judicial action or false reasoning and should not be used as a base to sustain a verdict of this amount but I do think it proper at this time to take these settlement conferences into consideration to point up the fact that all along prior to and during this trial all parties concerned were alerted to and recognized the fact that if the plaintiff carried the burden that was his and obtained a verdict it under the enormity of his pain, suffering, loss of earnings, permanent injuries and out of pocket expenses could be a verdict of tremendous

charge present value constituted prejudicial error.

Since the issue as to which remand is required solely and uniquely concerns damages, a complete new trial is not necessary. Here the interests of justice will be best served by restricting the new trial to the issue of damages. See Cromling v. Pittsburgh and Lake Erie R. R. Co., 327 F.2d 142 (3 Cir. 1964); Rosa v. City of Chester, 278 F.2d 876 (3 Cir. 1960). See also Mazer v. Lipschutz, supra. We therefore will order a new trial limited to the issue of damages.

The Electric Company has also appealed its adverse judgment in the third party action involving Trent's employer, Garden State, as third party defendant. It is unquestioned for the purposes of this case that Garden State occupied the status of independent contractor in its relation to the Electric Company on the Deepwater expansion project. Trent was precluded from bringing suit against Garden State because under New Jersey law an employee's right to workmen's compensation constitutes an exclusive remedy against his employer. The Electric Company as one of the primary defendants impleaded Garden State on the basis of an indemnity provision in the work contract between the two parties.

The question of Garden State's negligence with respect to Trent's accident was submitted to the jury in the form of the eighth and ninth interrogatories, and it found that Garden State was free of negligence. A judgment of no cause of

action was entered respecting the third party claim.

■ The Electric Company challenges the validity of the judgment in the third party action on two grounds: first, that the court below failed to charge the jury with respect to the common law duty owed by Garden State to Trent, and second, that a certain statement in the charge justified an inference on the part of the jury that Trent did not bring suit against Garden State as a matter of choice. The facts material to these two contentions need not be detailed. It is sufficient to state that while we agree with enough of the substance of the Electric Company's contention to conclude that technical error was committed in the first instance cited and perhaps also in the case of the second, we also believe that a reading of the charge as a whole makes sufficiently plain that the asserted errors could not have been substantially prejudicial.

■ There remains to be considered the jury's finding of no negligence on the part of Garden State. In this regard we conclude that while a different jury might well have found to the contrary, we cannot say that the present finding was unwarranted as a matter of law. Evidence was introduced at the trial to the effect that one of Trent's Garden State superiors took steps to warn the electricians about the energized area and instructed them respecting the safest way to climb the tower. While Trent testified that he himself at no time had been warned and the jury, we assume, accepted this testimony,[15] nevertheless the jury could have

amount. The verdict is one of a tremendous sum of money, $350,000. In fact, it exceeds the sum of money earned by the average Federal judge during his lifetime upon the bench. I am under the impression that the average Federal judge serves about 13 or 14 years and this sum exceeds 15 years pay for a District Judge at the present rates.

"Viewed in this light this seems like too much money but on the other hand this plaintiff was a much younger man and had a much longer life expectancy than the average judge. He has and will suf-

fer tremendous pain. He has suffered great economic loss and his future earnings have been seriously impaired, and in the eyes of some could be determined to be a total cripple.

"Under all the facts and circumstances I cannot hold that the amount, $350,000 is excessive, and the result of passion or prejudice. Consequently, the verdict will not be disturbed."

15. A Garden State foreman testified that he had warned the electricians including Trent that the buses in proximity to the

found that the measures taken by Garden State were adequate under the circumstances and that it was reasonable for it to conclude that its warnings had been heard by all of the electricians including Trent. It follows that the jury's finding as to the lack of negligence of Garden State cannot validly be disturbed.[16]

The trial in this case consumed a total of fourteen days. It was a long and complicated case. Its outcome in some respects may not be so logical as other possible results that could be imagined. We think, however, that all of the jury-findings respecting negligence are supportable by the record and manifest no fatal inconsistencies.

We have considered the other points raised by the parties and are of the view that none requires discussion.

The judgment in the principal action will be reversed to the extent indicated and a new trial will be ordered limited to the issue of damages. The judgment in the third-party action will be affirmed.

Costs in this court will be awarded to the third-party defendant, Garden State Construction Company, as against Atlantic City Electric Company, and as between the parties to the principal action each party will bear its own costs in this court.

tower were energized and that if they had occasion to climb the tower, they should ascend the north side of the north leg rather than the south side which apparently was more dangerous. The jury seemingly accepted, or at least could have accepted the testimony of the foreman in general but in view of Trent's statements, thought the foreman was mistaken in regard to Trent.

16. Trent and the electrician accompanying him whose name was Scarle, were ascending the south side and north side of the tower's north leg respectively at the time of the accident. Presumably, Scarle was one of the electricians who had been warned as indicated in note 15 supra. In any event Scarle testified that at the time of the accident he knew that the buses were energized and that he assumed that Trent also had knowledge to this effect. The fact that Scarle, or for that matter the Garden State electrician who had ordered that the "T" be moved in the first place, did not caution Trent with respect to the energized buses and switch jaws, cannot validly be termed negligence as a matter of law for two interrelated reasons: first, the assumption respecting Trent's knowledge was not unreasonable; and second, particularly in light of such assumed knowledge, climbing the south side, while perhaps a good deal more risky than climbing the north side, seemingly did not make Trent's accident inevitable. See the discussion in note 12 supra.