Frank **COUGHLIN, Padre Concrete Corporation, A. W. Van Cleave, Jr. and Allied Crushed Stone Company, Plaintiffs-Appellants,**

v.

**CAPITOL CEMENT CO. et al., Defendants-Appellees.**

No. 76–4387.

United States Court of Appeals, Fifth Circuit.

April 10, 1978.

Emmett Cole, Jr., Victoria, Tex., J. Dan Bohannan, Logan Ford, Dallas, Tex., for plaintiffs-appellants.

Stanley E. Neely, Nathan L. Hecht, Dallas Tex., Robert W. Wachsmuth, San Antonio, Tex., for Capitol Aggregates.

Marvin Sloman, Robert H. Mow, Jr., Stephen L. Elliott, Dallas, Tex., for Kaiser Cement & Gypsum Corp.

Before TUTTLE, COLEMAN and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal in a private antitrust action instituted by two individual and two corporate plaintiffs pursuant to 15 U.S.C. § 15.[1] The original complaint alleged that

1. Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him

defendants-appellees, Capitol Aggregates, Inc. [hereinafter "Capitol"] and Kaiser Cement & Gypsum Corporation [hereinafter "Kaiser"],[2] and several non-party entities[3] had engaged in a concerted refusal to sell bulk cement to plaintiffs-appellants, in violation of section 1 of the Sherman Act.[4] Following an 11-day trial, the district court denied defendants' motions for directed verdict and submitted the case to the jury, which held for the defendants.[5] Plaintiffs' motion for a new trial, which alleged 115 errors during the course of trial, was denied, and this appeal followed. On appeal, a 4000-page record and eighteen separate enumerations of error are presented for review. We shall "[b]egin at the beginning . . . go on till [we] come to the end,"[6] then affirm.

## I. BACKGROUND

The plaintiffs here are two individuals, Frank Coughlin and A. W. Van Cleave, Jr., and two corporations, Padre Concrete Corporation [hereinafter "Padre"] and Allied Crushed Stone Company [hereinafter "Allied"]. Both before and during the period in question, Coughlin was the president and majority stockholder of Padre, while Van Cleave was the president and sole stock-

holder of Allied. To place the substantive aspects of the case in the proper context, it is first necessary for us briefly to outline the relationship among these four parties and their efforts to enter the San Antonio, Texas concrete market.

Frank Coughlin spent almost his entire adult life in the ready-mix concrete business. He initially entered the field by way of his father's ready-mix business in Corpus Christi, Texas, and subsequently was a partner in Coast Materials Concrete and an employee of the Alamo Lumber Co. During his nine years with Coast Materials, Coughlin assumed primary responsibility for the operation of ready-mix plants in Beeville, Three Rivers and Refugio, Texas. In an effort to capitalize on his accumulated experience, Coughlin organized Padre in 1965. Although Padre began operations with only a single plant in Beeville, Texas, additional plants were added in Kingsville, Corpus Christi and Three Rivers by 1968.

A. W. Van Cleave, Jr., on the other hand, was a stranger to the ready-mix business. In 1967, however, through an inheritance from his father-in-law, Van Cleave obtained a crushed limestone company and certain aggregate-producing equipment. By way

---

sustained, and the cost of suit, including a reasonable attorney's fee.

Clayton Act § 4, 15 U.S.C. § 15.

**2.** Although Kaiser is a named defendant in this suit, the activities complained of actually involved Longhorn Cement Co., a division of Kaiser located in San Antonio, Texas.

**3.** As originally filed, plaintiffs' complaint named as defendants San Antonio Portland Cement Co., five San Antonio, Texas concrete concerns, including Schoenfeld Materials, Inc., Olmos Rock Products Corp., McDonough Brothers, Inc., V. J. Keefe Co. and Barlite, Inc. d/b/a Barrett Industries, and the San Antonio Ready Mix Concrete Association.

Summary judgment was granted in Schoenfeld's favor, and suit against the remaining parties was dismissed with prejudice on plaintiffs' motion. At trial, however, plaintiffs attempted to prove that the named defendants had conspired with each other or with one or all of these additional entities.

**4.** In pertinent part, section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in

restraint of trade or commerce among the several States . . . is declared to be illegal . . . ." 15 U.S.C. § 1. Although plaintiffs alleged several types of conspiratorial conduct, only the concerted refusal to sell was submitted to the jury.

**5.** The case was submitted in accordance with the special verdict procedures provided for in Fed.R.Civ.P. 49. The first of six "interrogatories" posed the following inquiry:

Do you find from a preponderance of the evidence that during the period alleged and continuing to the present the defendants, or either of them, entered into a contract, combination or conspiracy so as to create a restraint of trade under the law as given to you by the Court in my previous instructions? The jury answered this question in the negative, making it unnecessary to respond to the remaining interrogatories, which had been conditioned upon an affirmative response to the first.

**6.** L. Carroll, *Alice's Adventures in Wonderland* (1869).

of a similar bequest, Van Cleave's son, Bill Van Cleave, obtained title to some 500 acres of land in San Antonio, Texas. Van Cleave transferred his equipment to Allied and began producing limestone, washed gravel and sand from his son's acreage. The venture was not a success. Allied suffered a net loss in fiscal years 1967 and 1968 and by the spring of 1969 was not generating sufficient cash to meet its obligations.[7]

Padre's financial stability was equally precarious. In his pre-trial deposition, Coughlin admitted that he was "broke" by the spring of 1969 and was receiving "extreme pressure" from Padre's creditors.[8] Despite these seemingly insurmountable financial odds, Coughlin and Van Cleave decided to pool their personal and corporate resources in San Antonio. To this end they formed a partnership known as Northside Ready Mix [hereinafter "Northside"]. Under the terms of the partnership agreement, Padre furnished twelve ready-mix trucks, a batching plant and other equipment, which Coughlin transferred to San Antonio from his Kingsville, Texas plant. Padre was supposed to receive $1 per cubic yard of concrete sold in exchange for the trucks, and Northside funds were to be used to pay for maintenance, fuel and drivers' salaries. Allied agreed to provide a business location, i. e., the 500-acre site in San Antonio, an office, water, sand and gravel. Northside was to pay Allied for sand and gravel at prevailing market prices. The day-to-day operations of the new business were entrusted to Coughlin as the only partner with any experience. Northside opened for business on May 10, 1969.[9]

In the minds of Coughlin and Van Cleave, Northside was a sure bet. In addition to Coughlin's experience, Northside had sand, gravel, water and other utilities available on the actual plant site and "a construction boom was anticipated" in the vicinity. All that remained was a local source for the remaining essential ingredient of concrete, cement. Without attempting to summarize all of the relevant evidence, it may be said that Northside was unable to purchase bulk cement directly or indirectly from either of the named defendants or from the remaining local producer, San Antonio Portland. Both Van Cleave and Coughlin made repeated efforts to purchase for cash, credit or cashier's check, but each time came up empty handed. Efforts to substitute bag cement purchased from local outlets and bulk cement delivered from Houston, Texas proved inadequate.[10]

7. According to Van Cleave's deposition, Allied was "broke and nearly bankrupt prior to May 1969." Evidence presented at trial showed that Allied lost approximately $80,000 in 1967 and $15,000 in 1968.

8. The record indicates that Padre had a year-end deficit in excess of $100,000 for the years 1966, 1967 and 1968. In addition, eleven outstanding accounts had been reduced to judgment prior to Coughlin's move to San Antonio, and one creditor, Cen-Tex Cement Co., had garnished Padre's Beeville bank account.

9. Although it is unclear how much, if any, capital was provided Northside by Coughlin or Van Cleave, the record does show that one Roland Schmidt agreed to factor Northside's accounts receivable and did so on the strength of money borrowed on Bill Van Cleave's credit. The consensus of plaintiffs' and defendants' expert witnesses was that this arrangement was too costly and thus undesirable.

Nevertheless, these same experts disagreed as to the soundness of Northside's financial basis. Plaintiffs' expert, Dr. Frank Alesio, testified that there were no financial impediments to Northside's ability to survive as a going concern and that Northside began business in as good or better condition as the other San Antonio concrete companies. Defendants' experts, both of whom had examined the financial records of Padre and Allied, testified that Northside was not in a position to go forward in a normal market.

10. After it became clear that none of the local cement companies would supply Northside's needs, Coughlin and Van Cleave turned to the Lone Star Cement Company in Houston. Although there was an abundance of evidence presented at trial by both sides on the feasibility of a San Antonio concrete company surviving with Lone Star rather than local cement, Coughlin and Van Cleave considered Lone Star inadequate because it: (1) produced a darker colored concrete than local cement; (2) was not as consistently strong; and (3) had to be delivered from out of town. Because of these problems and because some San Antonio contractors specified that local cement be used, Coughlin and Van Cleave found Lone Star inadequate and at trial opined that a local supply of cement was essential.

Coughlin left San Antonio for good on August 26, 1969, and thereafter attempted to continue Padre's Beeville operation. That venture subsequently failed as did Padre's other plants. Van Cleave tried to operate the San Antonio ready-mix business in Coughlin's absence. Northside's assets were transferred to Allied, trucks were purchased and some local cement became available. These measures, however, were to no avail, and Allied finally went out of business in June 1970.[11] The lawsuit involved in this appeal was initiated two years later.

As previously mentioned, plaintiffs have presented eighteen issues on appeal. For purposes of discussion and analysis, the issues may be grouped into three basic categories: sufficiency of the evidence, jury instructions and evidentiary rulings. We now proceed to address each in turn.

## II. SUFFICIENCY OF THE EVIDENCE

The bulk of the proof tendered in the trial court was directed to the question of whether the defendants' refusals to sell to Northside were a result of concerted action or independent business judgment. The jury concluded that neither Capitol nor Kaiser had entered any contract, combination or conspiracy not to sell. On appeal, however, plaintiffs contend that "the evidence [was] legally insufficient to support the jury's verdict." But our review of the record reveals that plaintiffs failed to move for a directed verdict at the close of all the evidence or for a judgment n. o. v. following the return of the verdict. *See* Fed.R. Civ.P. 50. Without mentioning these crucial lapses in their brief, plaintiffs ask this court to review for the first time the sufficiency of the evidence.

It is well settled that in the absence of a motion for directed verdict, the sufficiency of the evidence supporting the jury's findings is not reviewable on appeal.

*Fugitt v. Jones*, 549 F.2d 1001, 1004 (5th Cir. 1977); *American Lease Plans, Inc. v. Houghton Construction Co.*, 492 F.2d 34, 35 (5th Cir. 1974) (per curiam); *Rawls v. Daughters of Charity of St. Vincent De Paul, Inc.*, 491 F.2d 141, 147 (5th Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 513, 42 L.Ed.2d 307 (1974). Federal appellate courts simply do not directly review jury verdicts. The policy underlying this rule is sound: a party is not permitted to gamble on the verdict and later question the sufficiency of the evidence that led to his defeat. *See House of Koscot Development Corp. v. American Line Cosmetics*, 468 F.2d 64, 67 (5th Cir. 1972); *Taylor v. Gulf States Utilities Co.*, 375 F.2d 949, 950 (5th Cir.), *cert. denied*, 389 U.S. 871, 88 S.Ct. 154, 19 L.Ed.2d 151 (1967). Under these circumstances, our inquiry is limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a "manifest miscarriage of justice." *American Lease Plans, Inc. v. Houghton Construction Co.*, 492 F.2d at 35; *Little v. Bankers Life & Casualty Co.*, 426 F.2d 509, 511 (5th Cir. 1970).

Plaintiffs did, however, raise the sufficiency issue in their motion for a new trial.[12] Although this action will not reopen the question foreclosed by plaintiffs' failure to move for a directed verdict, it is relevant to the nature of the review available here. As we said in *Little v. Bankers Life & Casualty Co.*:

When, as in this case, a motion for a new trial has been made on the ground of insufficient evidence to support the verdict and the like, the failure by the losing party to move for a directed verdict . . . still operates to foreclose consideration of the question of sufficiency on appeal, and

---

11. Bill Van Cleave foreclosed on Allied, transferred its assets to his own corporation, P.S.L., and continued the business at the same location.

12. Motions for directed verdict and judgment n. o. v. are not prerequisites to a motion for

new trial. *Urti v. Transport Commercial Corp.*, 479 F.2d 766 (5th Cir. 1973); *United States v. Bucon Constr. Co.*, 430 F.2d 420 (5th Cir. 1970); *Citizens Nat'l Bank of Lubbock v. Speer*, 220 F.2d 889 (5th Cir. 1955).

the appellate court may inquire only whether the trial court abused its discretion in overruling the motion for a new trial.

426 F.2d at 511, *citing Brown v. Burr-Brown Research Corp.*, 378 F.2d 822, 824 (5th Cir. 1967); *Pruett v. Marshall*, 283 F.2d 436, 438 (5th Cir. 1960). Of course, when we review the denial of a motion for new trial, we do not review "sufficiency" in its technical sense. What is in issue is whether there was an "absolute absence of evidence to support the jury's verdict." *Fugitt v. Jones*, 549 F.2d at 1004; *Litherland v. Petrolane Offshore Construction Services, Inc.*, 546 F.2d 129, 134 (5th Cir. 1977); *Urti v. Transport Commercial Corp.*, 479 F.2d 766, 769 (5th Cir. 1973); *Indamer Corp. v. Crandon*, 217 F.2d 391, 393 (5th Cir. 1954). On the basis of our reading of the record and understanding of the standards outlined above, we conclude that plaintiffs' position is meritless.

The record shows that Padre's Beeville operation purchased cement from Capitol on an open credit account for some time prior to 1969. As of April 30, 1969, less than two weeks before Northside became operational, Padre owed Capitol in excess of $25,000.[13] On May 16, 1969, Capitol's credit manager wrote Coughlin and demanded that Padre's account be made current by May 23. Payment was not forthcoming and Padre's account was put in a C.O.D. status around June 1. In an apparent effort to satisfy the outstanding obligation, Coughlin executed a note in Capitol's favor on June 20, 1969, and Padre's account was again changed to a "modified C.O.D." status.[14]

Capitol made some sales to Padre on this basis during June, July and August. Padre, however, missed the first payment on its note on August 15, 1969, causing Capitol to accelerate payment and put Padre sales back on a C.O.D. basis.[15] It was in this atmosphere that Coughlin approached Capitol for cement in San Antonio.

Most of the overtures to Capitol on behalf of Northside were made by Coughlin and Van Cleave to Carl Strating. Strating stated on several occasions that Capitol would not sell to Northside for cash or credit as long as Coughlin or Padre had any involvement in the new company. As Strating wrote in an August 15, 1969 letter to Van Cleave:

Our contention since [Northside] was organized has been that so long as Padre Concrete Corporation, which owes Capitol Cement a substantial past-due account, was involved . . ., we would decline any business association with Northside. . . . Please understand that this refusal . . . is a stand we feel we must take in an attempt to collect a long past-due account.[16]

Plaintiffs made much of the fact that Padre's credit standing was irrelevant, since Northside offered to pay cash for Capitol cement. Strating testified, however, that he told Coughlin that if any cash was available, Capitol wanted it applied to Padre's indebtedness rather than to a new venture.

Kaiser also had a history of sales to Padre, dating back to Padre's formation in 1965. From 1965 to 1967, Kaiser had no collection problems with Padre. In 1967, however, a dispute arose over a discount on

---

13. Specifically, Padre had a $14,137.22 current debt, $7,761.21 30-days past due and $3,973.77 90-days past due. The 90-day account was in the form of checks which Coughlin had requested held due to insufficient funds.

14. Carl Strating of Capitol explained at trial that C.O.D. sales required cash payment before any cement was unloaded. A "modified C.O.D." account involved a one load credit limit, *i. e.*, cash payment was required every other load of cement.

15. The note, which was in the amount of $28,-000, was never paid. Capitol eventually reduced the debt to judgment on December 22, 1969.

16. During the summer of 1969, at the behest of Coughlin and Van Cleave, an investigator from the Texas Attorney General's office visited Strating. Strating testified, without contradiction, that he told the investigator that Capitol's refusal to sell was predicated upon the association of Coughlin and Padre with Northside. Monty Tomerlin, a Capitol salesman, also testified that the only reason Capitol would not sell to Northside was that Coughlin owed Capitol money.

sales of cement. Wallace McGee, the San Antonio sales manager for Kaiser, testified that as a result of this controversy Coughlin called him and said that Padre would never again purchase from Kaiser, regardless of the price. As of March 18, 1969, however, Padre still maintained a C.O.D. account with Kaiser, and the record shows that a C.O.D. sale was made to Padre some time in April 1969. A few weeks later, Coughlin placed an additional order and assured McGee that Padre had the funds to pay. That order was never honored because McGee contacted Padre's bank in Beeville and learned that in truth the funds were not available.

At trial, McGee testified that he made it clear to Coughlin and Van Cleave that Kaiser would not sell to Northside because it had no credit and because of the prior bad experiences with Coughlin. In this same context, McGee testified that as a matter of company policy Kaiser did not make cash sales and that Van Cleave had refused to provide credit information on Northside in response to a normal Dun & Bradstreet credit check.[17]

■ Plaintiffs, of course, presented evidence designed to discredit defendants' claims that they refused to sell on the basis of independent business judgment. We intimate no view of the sufficiency of such evidence. The jury heard plaintiffs' proof and presumably considered defendants' reasons for not selling in light of it before concluding that no conspiracy had been shown. We therefore conclude that under the standards applicable here, the jury's verdict was supported by the evidence and that the district court did not abuse its discretion in denying plaintiffs' motion for a new trial.

## III. JURY INSTRUCTIONS

■ Plaintiffs present ten alleged errors with respect to instructions actually given

or refused by the district court. At the outset, it should be noted that the procedures followed below in the granting of exceptions to the court's charge created a substantial degree of unnecessary confusion on appeal. Fed.R.Civ.P. 51 provides that:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. *The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury . . . . .* No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, *stating distinctly the matter to which he objects and the grounds of his objection.* . . . [emphasis added]

We previously have stated that the purpose of the rule is "to lessen the number of technical errors by giving both the trial judge and the opposing attorney an opportunity to correct possible errors." *Pruett v. Marshall,* 283 F.2d 436, 441 (5th Cir. 1960); see 5A Moore's Federal Practice ¶ 51.04, at 2521 (2d ed. 1977). But the specificity requirement plays an additional and equally significant role, particularly in the context of instructions requested but not given—insuring clarity of the record on appeal. In the instant case, the district court simply granted a blanket exception to those instructions requested by plaintiff but not included in the court's charge, necessitating the filing of post-submission briefs to frame the precise questions presented on appeal. While this procedure is not challenged here, we take this opportunity to point out that the giving of automatic exceptions to requests for charge that are not granted is outside the letter and spirit of Rule 51. See *Trent v. Atlantic City Electric Co.,* 334 F.2d 847, 857–58 n. 4 (3d Cir. 1964).

---

**17.** McGee also was visited by the state investigator, see n. 16 *supra,* and testified that he told the investigator precisely what had been conveyed to Coughlin and Van Cleave. To be sure, Van Cleave testified that he had lunch with McGee around August 17, 1969, after Cough-

lin's departure, and that McGee again refused to sell to Northside because of the credit problem. McGee also explained that Kaiser was expecting a labor dispute and as a result was not taking new customers. Kaiser did in fact have a 5-week strike that fall.

### A. Per Se Violation

Plaintiffs' first attack on the court's charge involves a refusal to instruct the jury that a concerted refusal to sell is a *per se* violation of section 1 of the Sherman Act and that business or economic justifications for such a refusal were not to be considered in defense. In addition to the refusal to grant this requested charge, plaintiffs argue that several statements made during the charge ran afoul of the *per se* concept.

■ The parties agree, as they must, that the conduct attributed to these defendants, if found, would have amounted to a *per se* violation of the Sherman Act. Concerted refusals to deal, or group boycotts, are "presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *United States v. General Motors Corp.,* 384 U.S. 127, 146, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966) (citations omitted); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). But neither the Supreme Court nor this court[18] has ever held that each time such a theory of recovery is presented to a jury the court is bound to charge the jury as requested by these plaintiffs.

■ In reviewing a district court's instructions to the jury, we consider the charge as a whole, in view of the allegations of the complaint, the evidence presented and the arguments of counsel to determine whether the jury was misled and whether it understood the issues presented.

First Virginia Bankshares v. Benson, 559 F.2d 1307, 1316 (5th Cir. 1977); *Richardson v. McClung,* 559 F.2d 395, 397 (5th Cir. 1977) (per curiam); *Kyzar v. Vale Do Ri Doce Navegacai, S.A.,* 464 F.2d 285, 289 (5th Cir. 1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973). It is axiomatic that the court need not couch its charge in the precise language and form fancied by a litigant's attorney. *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1289 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Andry v. Farrell Lines, Inc.,* 478 F.2d 758, 759 (5th Cir. 1973); *Delancey v. Motichek Towing Service, Inc.,* 427 F.2d 897, 902 (5th Cir. 1970). As we said in *Houston v. Herring,* 562 F.2d 347 (5th Cir. 1977),

> "[t]he test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues."

*Id.* at 348–49, *quoting Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1100 (5th Cir. 1973). Application of these standards to the facts here convinces us that the court's charge was adequate and that there was thus no error in declining to give the requested instruction.

■ The theory of plaintiffs' case and the primary thrust of their proof was a conspiratorial refusal to sell. Although defendants presented proof that their decisions not to sell to Northside were made on the basis of independent business judgment,[19] they neither presented evidence nor

---

**18.** In *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.,* 463 F.2d 1002 (5th Cir.), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972), the district court submitted plaintiff's case to the jury on a "reasonableness" theory. On appeal, however, the court found that the activities complained of, if proved by a preponderance of the evidence, would constitute a *per se* violation of the antitrust laws, and held:

> The *plaintiffs were entitled to have the jury instructed* that [defendant's] policies . . , if proved by a preponderance of the evidence, constituted *per se* violations of the Sherman Act without the necessity of proof of "unreasonableness" and "anticompetitive effect".

Special Issue Number 3(c) did not so inform the jury. This requires reversal of the judgment entered below . . . .

463 F.2d at 1016 (emphasis added). The quoted language is not engraved in stone so that every antitrust plaintiff is "entitled" to an instruction embracing the precise words used by the *Warriner* court in deciding the issues there. The holding in *Warriner* may be met in a group boycott case if the charge as a whole accurately conveys to the jury, in whatever language, that such conduct alone is violative of the Sherman Act.

**19.** In their second enumeration of error, plaintiffs argue that the district court erred in admitting evidence of plaintiffs' poor credit standing

argued that any conspiracy found to exist was "reasonable." Nor did the court in its charge invite the jury to base its decision on any such factor. The court did not allude to any concept of "reasonableness" in cataloging the elements of plaintiffs' burden of proof and made clear the distinction between an unlawful conspiratorial refusal to deal and a refusal based upon business reasons.[20] As the court did in *World of Sleep, Inc. v. Stearns & Foster Co.*, 525 F.2d 40 (10th Cir. 1975), we conclude that

> the "rule of reason" issue was never really in the case, and hence no instruction on the matter was necessary. . . . The trial court, in affirmative fashion did instruct the jury, in effect, as to just what constituted a *per se* violation of the Sherman Act. Such is enough and the trial court need not instruct the jury as to all of the things is should *not* consider in determining whether there has been a violation of the Sherman Act.

*Id.* at 45 (citation omitted).

### B. *Plaintiffs' Credit Standing*

Plaintiffs next assert that the district court erred by instructing the jury that

their poor credit standing was a defense, since it was admitted that they offered to pay for cement in cash or by cashier's check.[21] In essence, plaintiffs ask us to declare that as a matter of law, poor credit cannot suffice to defeat circumstantial proof of conspiratorial conduct under the circumstances presented here. We decline to do so.

It is well settled that a manufacturer has a right unilaterally to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself. *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30, 33 (5th Cir. 1977).[22] Inherent in this right is the opportunity to show unilateral as opposed to conspiratorial conduct at trial. The defendants here introduced evidence tending to show that each viewed plaintiffs' poor credit as a legitimate basis for not dealing with Northside, regardless of the cash offers. There is no question but that they were entitled to proffer such evidence, see n. 19 *supra*, and that this evidence, together with other relevant testimony, raised fact issues for the

---

and instructing the jury that such was a defense, since plaintiffs offered to pay cash for cement. Although the instruction portion of this two-pronged attack is discussed in section III. B. *infra*, we find no error involved in the admission of evidence and see no need to elaborate extensively on the question. A manufacturer is entitled to present evidence tending to show that its refusal to deal with a given buyer was based upon independent business reasons rather than conspiracy. *Standard Oil Co. of California v. Moore*, 251 F.2d 188, 211 (9th Cir. 1957); *see Milgram v. Loew's, Inc.*, 192 F.2d 579 (3d Cir. 1951).

20. The court instructed the jury that:
> The cement manufacturer to whom the Plaintiff applied was entitled to refuse to deal with the Plaintiff or any other person for any reason, no matter how good or bad the reason was *so long as its decision was arrived at separately and distinctly and independently and not as a result of an agreement, combination or conspiracy, if any, with any of the alleged co-conspirators.*
>
> Thus, *unless* a Defendant cement manufacturer acted as a result of an alleged agreement, combination or conspiracy with the other Defendant cement manufacturers, or with at least one of the other named co-con-

spirators, its actions in refusing to sell [to] the Plaintiff were not illegal.
> So in this connection the acts done by the Defendants . . . were lawful acts . . *if they were not done as a result of and pursuant to* . . . *an alleged conspiracy* . . . . [emphasis added]

21. Plaintiffs apparently have confused the distinction between an attempt to prove that a refusal to deal was not the product of concerted action and an effort to justify a conspiracy found to exist. Both the evidence presented and the charge given here clearly dealt with the former.

22. We recognize that the so-called "Colgate doctrine" has been carefully circumscribed by the Supreme Court. *E.g., Simpson v. Union Oil Co.*, 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 38–49, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 722–23, 64 S.Ct. 805, 88 L.Ed. 1024 (1944). However, the post-*Colgate* decisions of the Supreme Court do not in any way limit a manufacturer's right to attempt to disprove the existence of concerted action.

jury. *See Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc). Defendants were thus entitled to have the jury instructed as to their claims. *See Daly v. Moore*, 491 F.2d 104, 108 (5th Cir. 1974); *Lind v. Aetna Casualty & Surety Co.*, 374 F.2d 377, 380 (5th Cir. 1967); *Blassingill v. Waterman Steamship Corp.*, 336 F.2d 367, 368 (9th Cir. 1964).

## C. *Specific Intent*

The Supreme Court has long held that a specific intent to restrain trade is not necessary in order to violate the antitrust laws. *See Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 173, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *United States v. Griffith*, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). With this principle in mind, plaintiffs contend that the district court erroneously instructed the jury that "an essential element of plaintiffs' case [was] specific intent on the part of the defendants to commit acts in furtherance of the conspiracy."

Initially, it should be pointed out that the portion of the charge devoted to the "essential aspects of this case" did not in any way improperly saddle plaintiffs with a burden of proving specific intent. However, in instructing as to the proof required to show a given party's participation in a conspiracy, the court said:

> To participate knowingly and willfully [in a conspiracy] means to participate voluntarily and understandingly and *with specific intent to do what the law forbids or with specific intent to fail to do what the law requires to be done, that is to say, to participate with a motive or purpose to disregard the law.* [emphasis added]

Following completion of the entire charge, plaintiffs objected to this instruction, correctly noting that "the Sherman Act does not require any specific intent to violate the law." In an effort to meet this objection the court gave an additional charge, emphasizing to the jury that "I want to be sure that there is no confusion about the definitions that I've given you with reference to conspiracy."

▇▇▇▇ In its substitute instruction, the court specifically told the jury:

> Now, irrespective of what I have said, if you find that the alleged conspiracy, if any, has been created or formed, *it is not necessary for the plaintiffs to establish and prove that any one of the co-conspirators intended to in any manner specifically or otherwise to violate the law.*
>
> The plaintiffs must only prove that the conspiracy . . . was formed and that the acts and deeds furthering and creating this conspiracy were willfully and knowingly done. In other words, *specific intent is not necessarily a willful design to violate the antitrust laws . . . because it is not necessary that the defendants know that they are violating the antitrust laws* if you find in fact they have in order to establish the conspiracy . . . . [emphasis added]

Although plaintiffs neither objected to this instruction nor requested any additional instructions, they now assert that the instruction was an incorrect statement of the law and was "confusing and incomprehensible."[23] Plaintiffs have given this court no guidance as to their precise complaints in this regard. In the absence of a proper objection made in accordance with Fed.R. Civ.P. 51, we will correct alleged errors in a jury charge only " 'in extreme cases, where the judge's error . . . is of such transcendent influence on the course of the trial . . . that . . . justice requires its being noticed and corrected.' " *Country Mutual Insurance Co. v. Eastman*, 356 F.2d

---

**23.** In *Garrett v. Campbell*, 360 F.2d 382 (5th Cir. 1966), we held that:

[C]ounsel never . . . objected at trial to the charge on the ground that it was ambiguous, incomprehensible, and unintelligible. . . . If, to people who knew most what the case was all about, the charge did not appear sufficiently ambiguous as heard to elicit an objection at that time, there is no ground for reversal even though in the cold bare type of an appellate record it may seem quite ambiguous.

*Id.* at 386–87 (footnotes omitted).

880, 882 (5th Cir. 1966) (per curiam), *quoting Maryland Casualty Co. v. Reid,* 76 F.2d 30, 33 (5th Cir. 1935). Considering the charge as a whole, we do not consider this to be such an extreme case.

### D. *Uniform Business Behavior*

■ In antitrust cases such as the one before this court, it is highly improbable that an express agreement not to sell, either verbal or written, can be shown. Circumstantial evidence thus assumes heightened importance and accordingly may sustain a finding of conspiracy. *See Milgram v. Loew's Inc.,* 192 F.2d 579, 583 (3d Cir. 1951); *Allied Paper Mills v. F.T.C.,* 168 F.2d 600, 607 (7th Cir. 1948). Plaintiffs here relied on such evidence, including a showing of uniform business behavior by defendants during the summer of 1969. On appeal, plaintiffs argue that the district court erroneously refused to instruct that an inference of conspiracy could be drawn from that behavior and that defendants had the burden of explaining their conduct by proof of independent business judgment. Since the court did instruct on "uniform behavior," plaintiffs' claim is in essence an assertion of error in the court's refusal to give their requested instruction.

■ There is no dispute but that uniform business behavior "is admissible circumstantial evidence from which the fact finder may infer agreement." *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969) (per curiam); *Theatre Enterprises, Inc. v. Paramount Film Distributing Co.,* 346 U.S. 537, 540–41, 74 S.Ct. 257, 98 L.Ed. 273·(1954); *Independent Iron Works, Inc. v. United States Steel Corp.,* 322 F.2d 656, 665 (9th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). But it is nothing more or less than that—a type of circumstantial

evidence—and alone does not make out a Sherman Act violation. *See Theatre Enterprises, Inc. v. Paramount Film Distributing Co.,* 346 U.S. at 540–41, 74 S.Ct. 257;, *Morton Salt Co. v. United States,* 235 F.2d 573, 577 (10th Cir. 1956).

■ The court here instructed that:

Mere similarity of conduct among various persons and the fact that they may have associated with each other and may have assembled together and discussed common aims, purposes and interests or . . . uniform behavior and action *does not necessarily establish proof of the existence of a conspiracy.* However, *the evidence need not on the other hand show that the members entered into express or formal agreement* or that they directly by spoken words or in writing stated between themselves what their object or purpose was to be or the details thereof . . . . [emphasis added]

The instruction concededly was not given in the precise language requested and perhaps did not stress this particular category of proof as much as plaintiffs would have preferred. However, considering the charge as a whole in light of the evidence and the arguments presented, we conclude that the challenged instruction adequately conveyed to the jury a correct understanding of the applicable law. Further amplification as to the probative value of uniform conduct was not required. *See Delancey v. Motichek Towing Serv., Inc.,* 427 F.2d at 902, *citing United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947).[24]

### E. *The Continuing Nature of Conspiracy*

As previously indicated, Interrogatory No. 1 asked the jury whether the evidence showed that "during the period alleged and continuing to the present the defendants, or either of them entered into a contract, combination or conspiracy." See n.5 *supra.*

---

**24.** As for plaintiffs' contention that the court should have instructed that defendants had the burden of negating any inference of conspiracy that might flow from proof of uniform behavior, we note only that the jury was instructed as to each defendants' claims of "independent business judgment" and that "the burden of proof rested upon the party, either plaintiff or defendant, who asserted the affirmative of any proposition necessary to be established." The jury verdict, which we have sustained, is perhaps the best indication that the defendants in fact met this burden.

Plaintiffs insist that the quoted language "required the jury to find that the conspiracy continued in existence to the present" in order to find defendants liable. Since the evidence showed that at least one of the defendants sold cement to Van Cleave in the fall of 1969, it is argued that the court should have instructed on the presumption that a conspiracy continues until its objects are accomplished or until an affirmative act of withdrawal or termination. Although we have no quarrel with plaintiffs' recitation of conspiracy law, we find no merit in the precise argument before us.

First, we do not read the interrogatory to require a finding that the conspiracy continued until the time of trial. Indeed, it asks whether defendants "entered" a conspiracy at any time prior to trial. Moreover, the question of withdrawal was never in the case. Neither the defendants nor the other alleged conspirators claimed or introduced any evidence tending to show that if there was a conspiracy they had withdrawn from it by a given date. The issue was whether there was a conspiracy at all. Although the requested instruction may have been necessary had the court submitted an interrogatory in the language requested by plaintiffs,[25] under the circumstances we perceive no error in refusing "a request for an instruction that correctly states a legal abstraction not applicable to the facts." *Daly v. Moore,* 491 F.2d at 108, citing *Jackson v. Southern Railway Co.,* 317 F.2d 532 (5th Cir.), *cert. denied,* 375 U.S. 837, 84 S.Ct. 77, 11 L.Ed.2d 65 (1963).

### F. *Conspiratorial Pressure*

Plaintiffs' requested instructions would have allowed the jury to find liability for either a conspiratorial refusal to sell cement or conspiratorial pressure on plaintiffs' customers to prevent purchases of concrete. The alternative conspiratorial pressure theory was not submitted to the trier of fact, and plaintiffs argue that such was error in light of the evidence. It is settled that

plaintiffs were entitled to have the jury instructed on their theory of law "if there [was] sufficient evidence to support such a theory." *Daly v. Moore,* 491 F.2d at 108; *Delancey v. Motichek Towing Service, Inc.,* 427 F.2d at 902.

We have carefully considered the evidence identified in plaintiffs' brief as relevant to this question. Briefly, the record shows that Walter Rodgers, a San Antonio contractor, was told by Ray Taylor of V. J. Keefe concrete company that Rodgers would not be in business long if he continued to purchase from Northside. Rodgers further testified that he quit purchasing from Northside out of fear that the local concrete companies would cut him off. However, in determining the existence of any conspiracy, the jury would not have been permitted to consider Rodgers' hearsay account of Taylor's comments against any defendant or alleged conspirator except Taylor's employer, V. J. Keefe Co. *See United States v. Apollo,* 476 F.2d 156 (5th Cir. 1973). Similar testimony was provided by Bob Renfro. He testified that Carl Strating of Capitol refused to sell him cement for a Northside job, stating that "our truck drivers are scared if they drive in [Northside's] gate they would get killed." Strating also purportedly suggested that Renfro "go to Barrett or Schoenfeld or . . . some place else" to get his concrete.

Plaintiffs also point out evidence showing that representatives of the cement and concrete companies parked outside Northside's gate, which, in plaintiffs' words, "would certainly have an adverse effect on Northside's customers not unlike a picket line." In his deposition, Ben Peterson, a Northside salesman, did in fact state that on separate occasions he had seen Doc Nelson of Kaiser and Mr. Bohannon of San Antonio Portland parked in their cars within view of Northside's gate. Nelson admitted as much and testified that he had done so to see if any cement companies delivered to Northside.

**25.** Plaintiffs' requested interrogatory asked: "Do you find from a preponderance of the evidence that *during the period alleged and* *continuing to the present time that there was a contract, combination or conspiracy . . . ?"* (emphasis added)

Another Northside salesman, Rudolph Rubio, likewise stated in his deposition that he had seen Frank Bless of Capitol parked near the gate.[26] However, neither Peterson, Rubio nor any other witnesses ever testified that any Northside customers had any knowledge of these activities or that there was even a tangential effect on Northside's sales. The "picket line" analogy was wholly of counsel's own making. Furthermore, there was no proof that this conduct was concerted. Under these circumstances, we do not consider the testimony of Rubio or Peterson to in any way advance plaintiffs' claim to the requested instruction.

In the final analysis, plaintiffs' argument must stand or fall on the testimony of Renfro and Rodgers. We conclude that evidence admissible only to show that representatives of two concrete companies threatened or discouraged Northside customers was insufficient to require submission of plaintiffs' theory. There simply was no admissible evidence from which the jury could have inferred the requisite unlawful behavior on the part of these defendants. Thus, no error was committed in not giving the requested instruction. *See Boeing Co. v. Shipman,* 411 F.2d at 374 ("A mere scintilla of evidence is insufficient to present a question for the jury."); *Dores v. Anderson,* 295 F.2d 496, 497 (5th Cir. 1961) (per curiam), *cert. denied,* 369 U.S. 862, 82 S.Ct. 952, 8 L.E.2d 19 (1962).

Plaintiffs' remaining contentions relative to the court's charge can be answered without extensive discussion. First, it is argued that the court should not have instructed the jury that the availability of an alternate supply of cement from Houston was a defense to the alleged concerted refusal to deal. The evidence presented on this point and the court's recitation of defendants' "claims" that Northside had an alternative supply of cement clearly related only to the questions of proximate cause and damages. Since the jury reached neither question, the error, if any, was harmless. *See* Fed.R.Civ.P. 61; *Sue v. Chicago Transit Authority,* 279 F.2d 416, 419 (7th Cir. 1960).[27]

During the presentation of plaintiffs' evidence, numerous objections were made to the admissibility of statements attributed by plaintiffs' witnesses to alleged conspirators. On virtually every occasion, and again in its charge, the court instructed the jury that such hearsay evidence was not to be considered against any defendant or other alleged conspirator unless the jury first found on the basis of independent, non-hearsay evidence that a conspiracy existed. Plaintiffs asked that the jury be further instructed that once it found that a conspiracy had been shown, each conspirator was to be considered an agent of the other conspirators. We find no error in the court's refusal to so instruct. The court not only told the jury that each member of a conspiracy "becomes the agent of every other member," but also modeled its charge in accordance with our decision in *United States v. Apollo,* 476 F.2d 156, 163 (5th Cir. 1973). *See United States v. McDonnel,* 550 F.2d 1010 (5th Cir. 1977); *United States v. Rixner,* 548 F.2d 1224 (5th Cir. 1977).[28]

**26.** Rubio's precise testimony was that on one occasion either Ben Peterson or Van Cleave pointed to a car parked near the gate and told him that Frank Bless of Capitol and Bohannon of Portland were in it. At the time, Rubio knew neither Bless nor Bohannon, and at his deposition could only confirm Bless' presence.

**27.** Plaintiffs also complain of the court's charge on defendants' claim that the ready-mix operation conducted after Northside's demise, whether under the name of Allied or P.S.L., was in fact the "alter ego" of Van Cleave. This particular claim, however, which questioned the actual business relationship between Van

Cleave and his son, plainly related to the defense position that any profits earned by P.S.L. should be offset against any lost profits found to have been suffered by Van Cleave. Again, since the question of damages was never reached, the error, if any, was harmless.

**28.** During recent months, there has been some discussion in this circuit as to the continued validity of the decision of *Apollo,* which predated the Federal Rules of Evidence. *See United States v. Tenorio,* 565 F.2d 943, 944–945 (5th Cir. 1978); *United States v. Ochoa,* 564 F.2d 1155, 1157–58 & n. 2 (5th Cir. 1977); *United States v. Brown,* 555 F.2d 407, 423 & nn. 38 &

There was no error in refusing further amplification.

## IV. EVIDENTIARY RULINGS

### A. *Documents*

As part of plaintiffs' proof, both Coughlin and Van Cleave testified that they met with Bill Worth of McDonough Brothers on May 16, 1969. Following an *Apollo* instruction, both were permitted to testify that Worth told them that no new concrete companies were allowed in San Antonio without approval from the existing companies and that concrete prices would be slashed if Northside attempted to enter the market. Worth denied making the statements attributed to him and testified that concrete prices in fact remained stable after Northside became operational. In the course of Worth's testimony, defendants introduced two letters written within two weeks of the May 16 meeting. The first, dated May 23, 1969, was from plaintiffs' attorney, George F. Manning, to Jim McDonough. The second, dated May 28, 1969, was from McDonough Brothers' attorney, Floyd McGowan, to Manning. Plaintiffs argue that both letters were hearsay and that the court erred in admitting them into evidence.

Both letters obviously contained multiple hearsay declarations. *See* Fed.R.Evid. 801(c). Manning's letter purported to relate statements attributed to Bill Worth by Van Cleave and Coughlin. The second letter contained McGowan's statement of information obtained from Worth and perhaps McDonough. Fed.R.Evid. 805 provides that "[h]earsay included within hearsay is not excluded under the hearsay rule *if each part of the combined statements conforms with an exception* to the hearsay rule provided in these rules." (emphasis added). The only exception urged by defendants to be applicable here is Fed.R.Evid. 801(d)(2)(C), which states: "A statement is not hearsay if . . . [t]he statement is offered against *a party* and is . . . a statement by a person *authorized by him* to make a statement concerning the subject." (emphasis added).[29]

With respect to Manning's letter, however, that Rule does not provide a complete solution, since the letter contains information attributable to a non-party, Bill Worth. The second letter also is not admissible under the exception. "[A]dmissions must be the statements *of a party* to the lawsuit (or his predecessor or representative) and *must be offered not for, but against him. . .*" McCormick, *Evidence* § 262, at 631 (Cleary ed. 1972) (emphasis added). In the absence of any other applicable exception, *see* Fed.R.Evid. 803, 804, we conclude that the letters should not have been admitted.

▐ The Federal Rules of Civil Procedure, however, provide that:

No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict . . . unless refusal to take such action appears to the

---

39 (5th Cir. 1977). Fed.R.Evid. 801(d)(2)(E) provides that a statement offered against a party-opponent is not hearsay if "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The essence of this exception is a finding that a conspiracy actually existed and that the defendant participated therein. *Apollo* permits the jury to make these preliminary findings on the basis of independent, non-hearsay evidence. 476 F.2d at 163. However, Fed.R.Evid. 104(a) requires that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined *by the court*." (emphasis added).

The Court of Appeals for the First Circuit has concluded that Rule 104 eliminates the jury's role in the preliminary determination of the existence of a conspiracy. *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977); *see* 1 Weinstein, *Evidence* § 104[b] (1976). But we need not reach the issue here, since plaintiffs neither objected to the court's adherence to *Apollo* nor suggest any error in this regard on appeal.

29. [T]he issue of whether the statements of an attorney . . . are receivable as admissions against the client . . . is treated as a question of whether they have authority to act as agent and whether the statements were made in the course of exercising their authority.

4 Weinstein, *Evidence* ⸙ 801(d)(2)(C), at 801-127 (1976).

court inconsistent with substantial justice. The court at every stage of the proceedings must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Civ.P. 61; see Fed.R.Evid. 103(a). The burden of showing that "substantial rights" were affected rests with plaintiffs. Under the circumstances we hold that the requisite showing has not been made and that the error was therefore harmless. The Manning letter was wholly consistent with the live testimony of Van Cleave and Coughlin and, if anything, bolstered their testimony rather than assailed it. See Lasiter v. Washington National Insurance Co., 412 F.2d 594, 597 (5th Cir. 1969). And the McGowan letter did no more than reiterate Worth's testimonial denial of having made the statements attributed to him. The improper admission of hearsay testimony which is merely cumulative on matters shown by other admissible evidence is harmless error. American Motorists Insurance Co. v. Landes, 252 F.2d 751, 753 (5th Cir. 1958).

 Various activities of the San Antonio Ready-Mix Association were brought out by plaintiffs in an effort to show, among other things, cooperative bidding on the sale of concrete and control of the San Antonio market by the existing companies. On two occasions, plaintiffs attempted to put in evidence a copy of an "agenda" for the January 30, 1969 meeting of the Association. Although plaintiffs urged that the document was admissible under the "business records" exception to the hearsay rule, the court refused to admit it because of a lack of authentication. We find no error in the court's ruling.

Fed.R.Evid. 803(6) excepts from the hearsay rule:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation *all as shown by the testimony of the custodian or other qualified witness* . . .. [emphasis added]

There can be no doubt but that the party who seeks to introduce written evidence must in some way authenticate it. *Grey v. First National Bank of Dallas*, 393 F.2d 371, 386 (5th Cir.), cert. denied, 393 U.S. 961, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968). We agree that under the exception,

[t]he testimony of the custodian or other qualified witness who can explain the record-keeping of the organization is essential. If the witness cannot vouch that the requirements of Rule 803(6) have been met, the entry must be excluded.

4 Weinstein, *Evidence* ¶ 803(b)[02], at 803–143 (1972). Only two witnesses testified with respect to the agenda. J. Dan Bohannan, one of plaintiffs' attorneys, testified that he found it in the Association's files during discovery and acknowledged that it did not bear a signature. Bohannan knew nothing else about the source or authenticity of the document. Doug Riff, who was president of Olmos Rock Products Corp. and an officer of the Association in 1969, identified the agenda and stated: "I don't know who prepared it. I suppose Al Brown." Brown, the executive director of the Association, was not available to testify. We hold that the testimony of these two witnesses did not satisfy the authentication requirements of Rule 803(6) and that the agenda therefore was properly excluded. *Bruce v. McClure*, 220 F.2d 330, 334–36 (5th Cir. 1955); see *United States v. Lykes Brothers Steamship Co.*, 432 F.2d 1076, 1078–79 (5th Cir. 1970).[30]

---

**30.** Even if the document had been authenticated properly, its exclusion could not have prejudiced plaintiff. Over defendants' objection, Riff was permitted to read into the record the relevant portion of the agenda. The trial judge subsequently remarked "I think [Doug Riff] has testified about everything you want from him without [admitting the agenda]." Plaintiffs' counsel replied, "Probably so, Your Honor."

During their case in chief, plaintiffs intended to present the pre-trial depositions of certain officers of the defendant cement companies and of San Antonio Portland. When plaintiffs offered portions of Carl Strating's deposition, defendants objected on the ground that Strating was available and would testify in the case. The court, in an effort to avoid duplication, restricted plaintiffs' use of the deposition to cross-examination but assured plaintiffs that they could call Strating as an adverse witness and introduce in rebuttal any information not covered in Strating's live testimony.

▆▆▆▆ The Federal Rules of Civil Procedure provide that "[t]he deposition of a party or . . . an officer . . . of a public or private corporation . . . which is a party may be used by an adverse party for any purpose." Fed.R.Civ.P. 32(a)(2). As stated, the Rule permits a party to introduce the deposition of an adversary as part of his substantive proof regardless of the adversary's availability to testify at trial. *Fey v. Walston & Co., Inc.,* 493 F.2d 1036, 1046 (7th Cir. 1974); *Community Counselling Service, Inc. v. Reilly,* 317 F.2d 239, 243 (4th Cir. 1963); 4 Moore's Federal Practice ¶ 26.29, at 1653 (2d ed. 1968). Although the court's action here was error,[31] we conclude that plaintiff was in no way prejudice thereby.

Plaintiffs used Strating's deposition to impeach his live testimony and were given an opportunity to introduce any evidence contained in the writing that had not been covered. Moreover, there has been no showing either below or on appeal that Strating's live testimony fell short of any appearing in the deposition or that plaintiffs were in any meaningful way deprived of their ability to present material evidence to the trier of fact. *See Fenstermacher v. Philadelphia National Bank,* 493 F.2d 333, 338 (3d Cir. 1974); *Pingatore v. Montgomery Ward & Co.,* 419 F.2d 1138, 1142 (6th Cir. 1969), *cert. denied,* 398 U.S. 928, 90

S.Ct. 1818, 26 L.Ed.2d 90 (1970); *Pursche v. Atlas Scraper & Engineering Co.,* 300 F.2d 467, 488–89 (9th Cir.), *cert. denied,* 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 179 (1962).

## B. *Testimony*

▆▆▆▆ When it became clear to plaintiffs that they would not be able to purchase directly from any of the local cement companies, they attempted indirect purchases through Singleton Lumber Co. and a local contractor, Bob Renfro. The record indicates that Robert Singleton called Kaiser and San Antonio Portland but was unable to secure delivery to Northside. Renfro called Carl Strating of Capitol and likewise obtained a negative response. One of Northside's salesmen, Ben Peterson, overheard Singleton's calls and both Peterson and Rudolph Rubio were present for Renfro's conversation. Plaintiffs offered portions of Peterson's and Rubio's depositions relating what they had heard on these occasions. Over plaintiffs' protestations that the statements were offered only to show that certain remarks had been made, the court excluded them as hearsay. Although a statement not offered "to prove the truth of the matter asserted" is by definition not hearsay, Fed.R.Evid. 801(c), the error in the court's ruling was harmless.

Peterson's deposition, had it been admitted, would have shown that Singleton called Kaiser and asked to purchase cement for delivery to Northside. In addition, Singleton offered to pay for the cement himself. Kaiser refused to make the sale. Although Singleton did not remember the call, Wally McGee of Kaiser testified that he recalled Singleton's call and that he refused to deliver cement to Northside. Coughlin, who was present during the conversation, also testified as to McGee's refusal. It is clear that the substance of Peterson's deposition, *i. e.,* the request to purchase, terms of purchase, place of delivery and refusal to sell, was

---

31. Although we have found the court's ruling erroneous in the precise circumstances presented here, we do not intend to unduly limit the trial judge's discretion in these cases to exclude repetitious matter and to require counsel to identify the relevant portions of a deposition in his offer. *See Fey v. Walston & Co., Inc.,* 493 F.2d 1036, 1046 (7th Cir. 1974); *Zimmerman v. Safeway Stores, Inc.,* 133 U.S.App.D.C. 342, 345, 410 F.2d 1041, 1044 n. 5 (1969).

made a part of the record evidence for the trier of fact.

As for Singleton's conversation with Bohannon of San Antonio Portland, the court admitted, over defense objection, the following statement from Peterson's deposition: "He [Singleton] told them the same identical thing he had told [Kaiser]." In addition, Singleton himself testified as to what was said during the conversation, including the fact that Bohannon refused to sell despite Singleton's offer to pay. Peterson's account of the conversation would have been cumulative.

Renfro testified that he called Carl Strating of Capitol, offered to pay cash for a load of cement and that Strating refused to deliver to Northside. Strating also testified. He confirmed that Renfro called and that he told Renfro that he would not sell if Northside was involved. Although Strating did not recall Renfro's offer to pay cash, he testified that even that factor would not have altered his position. The depositions of Rubio and Peterson merely reiterate Renfro's cash offer and Strating's response that Capitol would under no circumstances sell to Northside. Moreover, the court admitted a portion of Peterson's deposition relating that no cement was delivered from Capitol despite Renfro's promise to pay. In light of the abundance of testimony as to this conversation, particularly that of the actual participants, we hold that exclusion of the two depositions was harmless.

We have carefully considered the other matters raised in plaintiffs' briefs and find no reversible error. In light of our holdings that the district court properly instructed the jury as to the applicable law and that the jury's verdict against plaintiffs was supported by the evidence, the judgment is

AFFIRMED.